15028

STATE EX REL. EDWARDS *ET AL.* v. OSBORNE *ET AL.*

(7 S. E. (2d), 526)

January, 1940.

*Messrs. Samuel Want, James S. Verner, Sam Rogol* and *E. C. Dennis, Jr.,* for petitioners,

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey* and *M. J. Hough, Assistant Attorneys General, C. T. Graydon, Henry H. Edens* and *John Grimball,* for respondent,

February 27, 1940.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This is an application to the Supreme Court in its original jurisdiction by G. B. Edwards, a citizen and taxpayer of Darlington County, and F. L. Muldrow, a citizen of the same county and the owner of a State highway certificate of indebtedness,—who was allowed to intervene in the proceeding,—to restrain the respondents from issuing and selling $1,546,000.00 of State highway certificates of indebtedness, the proceeds from which sale, it is alleged, are to be turned over to the State Treasurer to be used for the current expenses of the State; and to enjoin the Highway Commission from paying over to the State Treasurer $454,-000.00 out of funds in the hands of the Commission, to be used for the current expenses of the State. This is a representative suit, and petitioners seek to have certain statutes, hereinafter more particularly referred to, authorizing the sale of the certificates and the transfer of the fund mentioned, declared unconstitutional. These proposed steps the petitioners alleged are in violation of their constitutional rights, and derogatory to the interest of the State.

The respondents are the South Carolina Highway Commission, the Chief Highway Commissioner, the Governor, and the State Treasurer.

It is charged in the petition that these officials, purporting to act under the provisions of Sections 99 and 100 of Act No. 346, 41 St. at Large, pp. 568, 649, approved July 1, 1939 (the general State Appropriation Bill for the fiscal year beginning July 1, 1939), have taken steps looking

toward the sale of the certificates of indebtedness, and the transfer of the funds above mentioned, with the purpose of having the money derived from the sale, and the $454,000.00 in the hands of the Commission, paid into the general treasury of the State and used in the payment of the State's current expenses. Injunctive relief is prayed.

A rule was issued by a Justice of this Court, directed to the respondents, requiring them to show cause why the prayer of the petition should not be granted. The respondents have made a joint return, in which they admit the factual allegations of the petition, but deny the factual and legal conclusions therein expressed. They also join in the demurrer to each petition challenging the conclusions of law upon which the petitioners rely, and contesting the claim of petitioners that they have an interest sufficient to enable them to maintain the action. It is specifically alleged in the petition that the Governor and the State Treasurer have undertaken to advertise for bids for the sale of the certificates of indebtedness, and that the State Highway Commission has been called upon for the transfer of the $454,000.00 to the State Treasurer. The proposed certificates would be payable over a period of thirteen years, extending to 1952.

The petitioners, upon various grounds, challenge the legality of the aforesaid acts and purposes and the constitutionality of the enactments upon which the same are based. The legislation which is assailed is embraced in Sections 99 and 100 found in the general State Appropriation Bill. These sections read as follows:

"§ 99. From the proceeds of the sale of State Highway certificates of indebtedness to be issued and sold during the fiscal year July 1, 1939—June 30, 1940, pursuant to authority contained in Chapter 127 of the Code of Laws of 1932, the State Highway Department is hereby authorized and directed to pay to the State Treasurer the sum of $1,-546,000.00 which amount shall be credited to the general fund of the State and used for the current expenses of

the State for the fiscal year commencing on the first day of July, 1939.

"§ 100. The State Highway Department is hereby authorized and directed to pay from its current revenues derived from the five cents gasoline tax and the motor vehicle license tax the sum of $454,000.00 to the State Treasurer, which amount shall be credited to the general fund of the State and used for the general expenses of the State for the fiscal year commencing on the first day of July, 1939, the said payment to be made at such time as may be agreed upon by and between the State Highway Department and the State Treasurer."

It is contended by petitioners that the legislation here under attack, which authorizes a diversion of highway funds to general State purposes, is an attempt to subvert the whole foundation upon which this Court considered it proper to sanction the issuance of highway certificates for highway construction, payable from a special fund,—that is, the gasoline tax and the automobile license fees, without requiring compliance with the constitutional direction that the public debt shall not be increased without a vote of the people. It is said that if the Legislature can at this time divert,—directly by the appropriation of $454,000.00 of highway funds, and indirectly by the sale of $1,546,000.00 of highway certificates,—the $2,000,000.00 of funds now involved, it can repeat the practice from year to year, with both lesser and larger diversions, and can thereby completely nullify in effect the judicial declaration as announced in many decided cases that State highway certificates of indebtedness are not debts of the State in a constitutional sense, because primarily they can be expected to be paid out of the special funds created and allocated for their payment.

We have been furnished with exceptionally able briefs by counsel for the petitioners and the respondents, commensurate with the importance of the case, which exhaustively review the history of highway legislation in this State, culminating in the passage of the State Highway Bond Act

(Act 1929, XXXVI St. at Large, page 670), providing for a State highway system of roads. And our attention is directed to the many cases decided by this Court in which these statutes have been construed and their constitutionality passed upon. Because of the comprehensive and enlightening character of the written arguments submitted, our task has been made much lighter in passing upon the issues presented in this proceeding, and in the preparation of this opinion.

A résumé of previous legislation dealing with our State highway system of roads, while perhaps not necessary, will serve as a useful introduction to our discussion of the questions now before us.

Under the law in force at the time of the passage of the Pay-As-You-Go Act of March 21, 1924 (XXXIII St. at Large, page 1193), the State Highway Commission, with the consent and cooperation of the local road authorities of the several counties, had created a more or less loosely connected system of highways. By the Act of 1924 these highways were incorporated, along with other highways authorized and directed to be maintained, into a closely knit highway system created by the Act, and the State Highway Department was charged with the construction and maintenance of these roads. It was provided by the Act, as amended, that such construction and maintenance should be by means of a fund consisting of Federal Aid money, the motor vehicle license tax, and three-fifths of the five cents gasoline tax. The Commission estimated that these revenues would be sufficient to complete the entire system within eighteen years from and after the year 1924, and made numerous agreements for reimbursements within that period. Owing to the fact that many miles of highway were added to the system by subsequent legislation, the Commission found it necessary to make a new estimate of the time required for the completion of the work.

Under Acts passed in 1926 and 1927, county and district bonds were issued on the faith of these highway rev-

enues. These Acts created a State obligation to collect the gasoline and license taxes, and to pay over to each county or road district the proportionate share of such taxes pledged to the retirement of the respective county or district bonds, and the Court recognized the legality of legislative action to create State obligations of this kind. *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538; *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153. Advances of large sums of money were made to the State which called for repayment by the State out of those yearly revenues, of which a continuing appropriation was made by the Legislature. The county bond plan, with its extension to a few isolated districts, while materially aiding construction in different sections of the State, was not adapted to any early completion of the statewide connected system of improved highways.

The inability of many counties to pay the interest on highway bonds issued by them, from the two cents gasoline tax distributed to them, was due to the fact that such distribution was made on the basis of motor vehicle license tax collections, rather than on the basis of mileage or cost of construction of state highways, in the several counties. Owing to this inability, many counties could not issue bonds under the reimbursement plan, and many of the most important highways in the State highway system were left to be constructed in the remote future under the so-called Pay-As-You-Go plan of financing. The Legislature in 1929 succeeded in remedying this situation, through the passage that year of the Act which provided for a comprehensive system of highways under a State unit plan, to be financed by the issuance of State highway certificates of indebtedness. This Act was declared valid and constitutional. *State ex rel. Richards v. Moorer,* 152 S. C., 455, 150 S. E., 269. These certificates of indebtedness and the reimbursement obligations were to be paid exclusively and primarily from the five cents gasoline tax and the motor vehicle license tax collected by the State Highway Commission. The obliga-

tions were also secured by the full faith, credit, and taxing power of the State.

The outstanding State highway certificates of indebtedness now amount to approximately $43,000,000.00. The amount of the obligations of the State Highway Commission under the provisions of reimbursement agreements,—some of which provide for the issuance of county or district bonds, and others of which provide for reimbursement to counties and towns for the cost, less depreciation, of the construction of roads, etc.,—is not stated in the record before us.

The certificates of indebtedness are issued under the provisions of Chapter 127 of the Code, Sections 5947 *et seq.* This Chapter embraces the Act of 1929 (the so-called State Highway Bond Act), the recitals of which include the following legislative findings:

(1) That the revenues "from the gasoline tax and the motor vehicle license fees will be sufficient, without resorting to a property tax," to pay the obligations in question herein.

(2) That the Supreme Court has held that obligations of the character in question, *"secured by a special fund* which may reasonably be expected to be sufficient to meet the payment of the obligations without resorting to a property tax, do not constitute debts within the meaning of the constitutional restriction upon the amount or method of incurring debt, notwithstanding that the full faith, credit and taxing power of a county, city or district are pledged." (Emphasis added.)

(3) That the proposed plan of highway development and financing would never cost the taxpayers of the State "one cent of property taxes."

*"The entire amount* of the revenues derived from the gasoline tax and the motor vehicle license tax * * * shall be turned over to or held by the State highway department" (or to the extent of five cents per gallon of the gasoline tax) and shall be paid out as provided in Section

5969 of the Code. This provision requires that the said funds shall be disbursed,

(a) For the expenses of the department, not exceeding $450,000.00 annually,

(b) For the payment of reimbursement obligations,

(c) For the payment of principal of and interest on certificates of indebtedness,

(d) For the required payment into the sinking fund.

"From the remainder of said estimated revenues * * * there is hereby appropriated a sum sufficient to maintain the highways" of the State highway system for the year in a sound and serviceable condition. Any surplus is appropriated for the construction and maintenance of highways, and for the payment "of other expenses of the State highway department."

In Section 5970 it is provided that out of the aforesaid revenues the Commission shall make certain reimbursements to counties for roads constructed by the counties, the same to be paid in installments over a period of years.

The distribution of the gasoline tax is covered by Sections 2507 and 2508 of the Code. It is therein provided that five cents per gallon of this tax "shall be turned over to the State Highway Department for the purposes of said department."

The State highway certificates of indebtedness are authorized "for the purpose of completing the construction of the State Highway System." Section 5947. See also Section 5951. The proceeds of sale of such certificates "shall be received by the State Treasurer and placed by him in a *special fund* to the credit of t h e State Highway Department." Section 5968. (Emphasis added.)

The sinking fund, subsection (d), to which reference has been made above, consists of one-half of the excess revenues, and is unimportant in this discussion. Section 5972. Under this provision less than $500,000.00 has been accumulated during the period 1920-1939, inclusive. The

State highway system includes two thousand miles of highways that are authorized but which are yet to be paved.

The State highway certificates of indebtedness with which we are hereby concerned are not general obligations of the State of South Carolina in the orthodox financial sense. While they are backed by the full faith and credit of the State of South Carolina, they are payable, as already stated, primarily out of a *special fund* consisting of the five cents per gallon gasoline tax and the motor vehicle license fees, which have been specially allocated for the payment of such obligations, and which under repeated decisions of this Court, have been found and declared to be a fund which may reasonably be considered adequate in itself to insure the payment of such certificates and the interest to accrue thereon as they mature.

Of course if there should be a material falling off in the revenues derived from the gasoline tax and the motor vehicle license fees, there would be no funds to proceed with the development of the highway system, and there would not be sufficient funds to pay maturing interest and principal on outstanding obligations, without resorting to taxation for that purpose. This would be true unless highway maintenance or other essential services are curtailed or are made a charge upon general revenues.

With these general but pertinent observations in mind, we first discuss the question whether the Legislature may direct the issuance and sale of State highway certificates of indebtedness to meet current expenses of the State, against the objections of a taxpayer, under the authority of Sections 99 and 100 of the Act of 1939 (Act 346, pp. 568, 649).

It is alleged in the petition that such proposed procedure:

(a) Violates Article X, Section 2, of the Constitution of South Carolina, which provides for the annual levy of taxes to pay estimated expenses, and for the levy of taxes in the succeeding year to meet a deficit;

(b) Violates Article X, Section 3, of the Constitution of South Carolina, which provides that taxes must be levied for specified objects, and that they shall be so applied;

(c) Violates Article X, Section 11, of the Constitution of South Carolina which prohibits the creation by the State of a public debt without a vote of the people.

The first constitutional provision invoked, Article X, Section 2, reads as follows: "Expenses of State Government.—The General Assembly shall provide for an annual tax sufficient to defray the estimated expenses of the State for each year, and whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year the General Assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year."

The first provision of this section requiring the imposition of a tax to defray the estimated expenses of the ensuing fiscal year is doubtless a matter entirely for the Legislature. But when the Legislature exercises its power to impose taxes, it is limited by this provision, as judicially construed, to the extent that it cannot make appropriations except for the expenses of the fiscal year for which the revenues are imposed. Accordingly, in the case of *State v. Warehouse Commission,* 92 S. C., 81, 75 S. E., 392, it was held that an appropriation made in the year 1912, and to be divided into two equal, annual installments to be disbursed, respectively, in 1912 and 1913, was a violation of the constitutional direction above stated. But this holding does not mean that the Legislature may not make so-called continuing appropriations such as are made in the legislation providing for the payment of highway certificates of indebtedness out of the annual collections of the gasoline tax and the motor vehicle license tax. These appropriations do not violate the constitutional provision here under consideration, for the obvious reason that they do

not constitute lump sum appropriations to cover disbursements extending beyond the ensuing fiscal year, but are in the nature of successive annual appropriations for disbursements of corresponding future years. *Arthur v. Johnston,* 185 S. C., 324, 194 S. E., 151; *State, ex rel. Richards v. Moorer et al.,* 152 S. C., 455, 150 S. E., 269; *Briggs v. Greenville County, supra.*

Nor, when a deficit occurs as the result of appropriations exceeding the annual income, is there any doubt of the power of the Legislature to issue notes upon which to raise money pending the levying of a tax for the ensuing year sufficient to pay the deficit. *Lott v. Blackwood et al.,* 166 S. C., 58; 164 S. E., 439; *Duncan v. Charleston,* 60 S. C., 532, 588, 39 S. E., 265.

But that is not the situation we are dealing with here. The certificates of indebtedness presently involved, and the $454,000.00 fund appropriated from highway revenues, admittedly represent a deficit in the revenues of the State under appropriations made for the fiscal year beginning July 1, 1939. The Legislature failed to follow the constitutional injunction to "provide for an annual tax sufficient to defray the estimated expenses of the state for each year." Instead of doing that, it levied taxes (including all sources of revenue imposed) in an amount that was insufficient by approximately $2,000,000.00 to comply with the constitutional requirements. To meet this known and anticipated deficit it resorted to funds already appropriated to special purposes.

The highway certificates of indebtedness being payable primarily out of the same special revenues from which the $454,000.00 would come, it is seen that the appropriations thus attempted to be made constitute a diversion of funds that have already been appropriated, and already partly collected for definite public purposes. It is, of course, not questioned that in any year the Legislature could impose gasoline taxes or motor vehicle license fees as part of the taxes to be collected for the ensuing year,

with which to meet the current expenses of the State for that year. But when the funds to which the Legislature resorts, though tax revenues in a legal sense, have already been appropriated and in part collected, it is utterly unsound to say that the diversion of such funds, from the purposes for which they were appropriated, to the payment of current expenses, is the same thing as the exaction of an annual tax to defray the expenses of the State for each year.

Furthermore, if the Legislature had said in so many words that to the extent of approximately $2,000,-000.00 the expenses of the State for the fiscal year beginning July 1, 1939, shall be paid by the sale of bonds payable over a thirteen-year period, it would hardly be denied that such bonds would constitute an unconstitutional increase of the public debt, because not authorized by a referendum. There is no power in the Legislature to issue State bonds otherwise than by an election as is provided in Article X, Section 11, of the Constitution. The power to issue notes implied from the provisions of Article X, Section 2, and Article X, Section 11, is expressly restricted to the issuance of notes that will be paid out of the tax levy for the ensuing year.

When that premise is conceded it is difficult, if not impossible, to draw a distinction between the validity of bonds so issued, and State highway certificates of indebtedness. Such certificates, when issued for a proper purpose, are not affected by the provisions of Article X, Section 11. But it must be kept in mind that their validity rests upon the lawful purpose for which they are authorized in the first instance, and upon the allocation of a special fund to pay the same, in such manner that it will not be necessary, presumably, to levy a tax in the ensuing year to meet their payment.

The invalidity of the present proposed bond issue under Article X, Section 2, of the Constitution, is made plain by the undeniable fact that whereas the constitutional provision expressly requires that the expenses of

the State shall be provided for through an annual tax levied each year to defray the estimated expenses of that year, the method of financing here adopted will result in paying the expenses of the fiscal year 1939-1940 in a substantial part by taxes levied over the period of thirteen years during which the bonds will run. The Legislature would thereby accomplish indirectly what it could not do directly.

Nor can it be said that the $454,000.00 fund sought to be diverted to State expenses represents taxes imposed for the fiscal year 1939-1940, because obviously that fund was payable at any time beginning July 1, 1939.

Are Sections 99 and 100 of the 1939 Act in contravention of Article X, Section 3, of the Constitution, which provides that taxes must be levied for specific objects, and that they shall be so applied? This Section reads: "§ 3. Tax Shall Be Levied in Pursuance of Law.—No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied."

Under the provisions of Sections 5969 and 5970 of the Code (taken from the Act of 1929), "the entire amount of the revenues derived from the gasoline tax and the motor vehicle license tax" are required to be turned over to and to be held by the State Highway Department for the purposes enumerated in these sections, the principal of such purposes being to comply with reimbursement obligations, and to pay the principal and interest on the State highway certificates of indebtedness. The remainder of such revenues is appropriated for the maintenance of the State highway system, and for the construction of new highways.

In Sections 2507 and 2508 of the Code it is provided that five cents per gallon of the gasoline tax "shall be turned over to the State Highway Department for the purposes of said department."

Thus we have a constitutional direction that a law which levies taxes shall distinctly state the object of the same, to which object the tax shall be applied; and a statutory imposition of a tax on gasoline and motor vehicles for the con-

struction and maintenance of highways, and for the payment of the principal of State highway certificates of indebtedness, and the interest accumulating thereon.

In this situation, Sections 99 and 100 of the 1939 Act nevertheless authorize the diversion of revenues collected for a specific purpose to entirely different purposes, to wit, the payment of the current expenses of the State for the fiscal year beginning July 1, 1939.

It may be conceded that the Legislature has plenary power in connection with the imposition of taxes to change its mind from year to year as to the purposes to which in each year it will apply the proceeds of particular sources of revenue (in the absence of any question of impairing the obligation of a contract) ; but under the present constitutional provision it is without power to impose a tax for a particular purpose, and before such purpose has been accomplished, to change its mind and direct the revenues derived from the particular tax to an entirely different purpose.

Speaking to this point in *Morton, Bliss & Co. v. Comptroller Gen'l,* 4 S. C., 430, 456, when considering a similar question involving a provision of the Constitution of 1868, which is identical with our present provision, the Court said: "If it had been intended that the Legislature should have any discretion as to the objects to which such funds should be applied, this clause would not have been inserted in the Constitution. Its insertion evidences the intent of the Constitution to deprive the Legislature of all power of misapplication, by an authoritative and imperative appropriation to the specific object set forth in the tax law as the ground of raising the specific tax. If the construction of the constitutional provision stopped short of this, it might entirely defeat the intent, for money might be raised by the Legislature under an Act strictly conformable to the Constitution as a mere pretext, and, afterwards, applied to any purpose desired by the Legislature. The efficient remedy was to stamp at once upon the fund the direction in which

it should be disbursed, and thus effectually to appropriate it in the sense of Section 12 (Article IX), which reads as follows: 'No money shall be drawn from the Treasury but in pursuance of an appropriation made by law'." (See similar provision in the Constitution of 1895, Article X, Section 9.) And see also *State v. Leaphart,* 11 S. C., 458, 470.

In *Southern Railway Co. v. Board of Com'rs of Mecklenburg County,* 148 N. C., 220, 61 S. E., 690, 699, the Court construed a provision of the North Carolina Constitution identical with the present provision. The controversy arose from an attempted diversion of a tax levied to pay interest on bonds. There was a surplus in the fund. The Court said: "While we cannot sustain his honor's judgment enjoining the entire levy, we are of the opinion that plaintiff, if so advised, is entitled to an order enjoining the appropriation of any part of the excess, over the interest on the bonds to any other purpose. It may be held to meet the interest accruing for the coming year, or for a sinking fund, as the provision of the Act, under which the bonds were issued, may provide. No more should be taken from the citizen, either natural or corporate, by way of taxation, than is reasonably necessary, and what is taken must be applied to the purpose for which it is taken, and 'no other.' When these well-defined limits are disregarded, taxes become oppressive. The increase in wealth and in valuation should result in decrease in the rate of taxation, otherwise we will have neither. The Courts should not and will not interfere in the administration of the internal domestic affairs of the counties and cities, unless there is a manifest disregard or abuse of power or discretion. Doubtless the custom has prevailed of supplementing one necessity by resorting to some other resource, without any purpose to violate the law. A man may do this in his private business, but it is not permissible in the administration of public business. Each fund, its resources and its disbursements, should be kept separate." And see Cooley on Taxation (4th Ed.), Sec. 1810.

We think it may not be questioned that the gasoline tax and the motor vehicle license tax constitute a special fund for the payment of State highway certificates of indebtedness, reimbursement agreements, and the other purposes specified in the law, and that this fund is not subject to a process of attrition by occasional or systematic diversion that will deplete the primary source with which to pay the heavy outstanding obligations of the State Highway Department.

It follows, in our opinion, that Sections 99 and 100 run counter to Article X, Section 3, of the Constitution.

The demurrers and returns of the respondents question the right and legal capacity of the petitioners to maintain the present action, upon the ground that they lack a requisite interest in the controversy. Section 442 of the Code on this phase of the case has not been invoked. On the contrary, due to the importance of the issues presented, and the nature and character of the interests involved, all parties in their briefs express the wish that the case be heard and decided upon the merits. We have, therefore, passed upon the validity of the laws in question without considering this objection.

We have not deemed it necessary to specifically and directly pass upon several other questions presented, one of which is whether the legislation is further objectionable as involving the unconstitutional impairment of the obligation of a contract arising out of the attempted diversion. This issue affects the intervening petitioner, F. L. Muldrow.

It is the judgment of this Court that Sections 99 and 100 of the Act of 1939 are invalid and unconstitutional for the reasons assigned. It is ordered that the respondents, members of the State Highway Commission and the Chief Highway Commissioner, be, and they hereby are, permanently enjoined and restrained from requesting or procuring the issuance and sale of the State highway certificates of indebtedness herein referred to; that the respondents, the Gov-

ernor and the State Treasurer, are permanently restrained and enjoined from advertising for sale, or issuing and selling said cetificates of indebtedness, or any part thereof; that the respondents, the members of the State Highway Commission and the Chief Highway Commissioner, are permanently restrained and enjoined from paying over to the State Treasurer the sum of $454,000,00, or any part thereof, under the terms of the aforementioned statutory provision applicable thereto.

MR. CHIEF JUSTICE BONHAM and MR. JUSTICE BAKER and MESSRS. ACTING ASSOCIATE JUSTICES E. C. DENNIS and WM. H. GRIMBALL concur.