15148

STATE *EX REL.* EDWARDS (McCULLOUGH *ET AL.,* INTERVENERS) v. OSBORNE *ET AL.*

(11 S. E. (2d), 260)

296

*Messrs. Samuel Want, James S. Verner, Sam Rogol,* and
*E. C. Dennis, Jr., George Bell Timmerman, D. W. Robinson*
and *N. A. Turner,* for appellants,

*Messrs. Pinckney L. Cain, C. T. Graydon, R. R. Williams, Jos. L. Nettles* and *C. B. Elliott,* special attorneys for respondents,

*Messrs. John M. Daniel, Attorney General, M. J. Hough,* and *T. C. Callison, Assistant Attorneys General,* for respondents,

October 21, 1940.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

By their petitions in the original jurisdiction of this Court the petitioner and intervening petitioners challenge the constitutionalty of an Act of the General Assembly, approved June 10, 1940 (Act No. 1019), appropriating two million dollars for the revenues derived from the five cents gasoline tax and the motor vehicle license fees to the payment of the State deficit for the fiscal year ending June 30, 1940, and to the general expenses of the State, in the manner and under the circumstances hereinafter set forth. Of this said sum, one million dollars is required by the Act to be paid by the Highway Department to the State Treasurer prior to December 31, 1940, and the remaining million dollars is required to be paid within the first six months of the calendar year, 1941.

The petitioner, Edwards, is a taxpayer residing in Darlington County. The intervening petitioners are the owners of State highway certificates of indebtedness in the principal amount of Three Hundred and Seventy-eight Thousand ($378,000.00) Dollars, no part of which is in default.

The respondents are the members of the State Highway Commission, the chief highway commissioner and the State Treasurer.

The petitioner and intervening petitioners (hereinafter referred to as petitioners) question the validity of the Act under discussion on three grounds, as follows: (1) That it violates the provisions of the Constitution of this State, Article X, Section 2, which provides for the payment of the ordinary expenses of the State and for the payment of a State deficit. (2) That it violates the provisions of the Constitution of this State Article X, Section 3, which provides that a statute that levies a tax "shall distinctly state the object of the same; to which object the tax shall be applied." (3) That it violates the provisions of the South Carolina Constitution. Article 1, Sections 5 and 8, of the United States Constitution, Article 1, Section 10, and Amendment XIV, Section 1, which prohibit the impairment of the obligation of a contract.

The relief prayed for is that the respondents be permanently enjoined from carrying out the requirements of the Act.

On the verified petition of the taxpayer petitioner, there was issued out of this Court a rule requiring the respondents to show cause why they should not be enjoined as prayed. Pending a hearing and until the further order of the Court, a temporary restraining order was granted.

The respondents, by demurrers and return, contest the contentions of the petitioners, and allege generally that the statute in question does not violate any of the constitutional provisions upon which the petitioners rely, and that it is the right and duty of the Highway Commission to pay over to the State Treasurer the funds appropriated as above stated.

It is alleged by the petitioners and admitted by the respondents that the State Treasurer called upon the Highway Commission for the payment of the first one million dollars of the appropriated funds, and that the Highway Commission,

if not restrained from so doing, would pay over to the State Treasurer the said amount of money for the purposes expressed by the statute.

It may be said here that aside from the constitutional questions presented by the pleadings, there is considerable statistical data in the pleadings, exhibits and briefs of counsel, around which much of the argument of counsel revolves. While there is little difference between the parties respecting the accuracy and completeness of most of the data, thus presented, the petitioners and respondents are far apart in their respective applications of this data to the legal issues to which counsel deem such data pertinent. As we view the problems presented by this case, however, such data, whatever interpretation we might place on them, are not controlling on any issue which we need now to decide. Hence, we will make only such references to these data as are desirable for the purpose of making more intelligible the problem dealt with in this opinion.

In approaching the problems presented by this case, we are mindful of the constitutional principles that legislative acts may not be invalidated in cases of doubt; that the Courts and the General Assembly are coordinate branches of the State Government and except where constitutional limitations have been clearly disregarded, it is not for this Court to pass on the propriety or soundness of the exercise of the legislative power.

We recognize the soundness of the distinction between *avoiding* constitutional restrictions and *evading* them, and that where a given course of legislative action has been declared by this Court to be unconstitutional, no stigma of illegality attaches to a later statute which recognizes the condemnation of the earlier law and seeks to avoid the defects of that law.

But we cannot dissipate constitutional provisions by forced construction, or by regarding form rather than substance. A statute is constitutional or unconstitutional by

reason of its scope and purpose and effect. Whatever the language used, we test the statute by a realistic consideration of the subject which it encompasses, the purpose which it seeks to serve, and the effect it will have when put in operation.

If constitutional limitations are directed to these factors, they must be given effect.

We are mindful, too, of the fiscal problems of the State that are wrapped up in the present litigation. But these are legislative problems. Our twofold duty is to refrain from interfering with legislative action which involves no clear constitutional infirmity, and to firmly condemn such action when it infringes upon constitutional restraints upon the legislative power. This Court has neither the power to levy taxes nor the power to appropriate the money made available by such levy, and in view of these indisputable facts, it cannot be charged with any portion of the responsibility for the financial problems under which the State is laboring.

The limitations on legislative power contained in the Constitution of 1895 are the fruits of generations of experience. They were adopted in the light of conditions that were both normal and subnormal periods of depression and prosperity, of war and peace, of wise governmental action and unwise governmental action, all of which played their part in dictating limitations on the legislative power in the interests of the people. It is no part of our right or duty to do more or less than dispassionately construe the constitutional provisions that have been invoked, and to determine whether the safeguards and restrictions that the framers of the Constitution saw fit to throw around the legislative function have been observed.

In these troublous times, with public finance and economic forces taking on aspects that challenge alike the pessimist and the optimist in looking to the uncertain days ahead, our solemn duty can be no less than that of being diligent to maintain the balance of governmental powers that give rise

to the power of a Court to declare an Act of the General Assembly unconstitutional.

On the matter of the financial situation of the State which gave rise to the enactment of the Act in question, the record discloses that as of June 30, 1940, there is a State deficit of $1,856,898.26, and that as of June 30, 1941, the combined deficit for the two fiscal years will approximate $3,000,000.00, without taking into account the appropriation made under the present Act.

The gasoline tax, of which five (5c) cents per gallon is "allocated for the purposes of the State Highway Department" is levied by an Act approved March 16, 1929 (Acts 1929, page 107). In the Code, this Act is found as Sections 2505 *et seq.* Section 2507, one of the provisions of the 1929 Act which the 1940 Statute attempts to amend, directs that five (5c) cents per gallon of the tax "shall be turned over to the State Highway Department". Other sections of the 1929 Act prohibit the Highway Department from issuing bonds or making reimbursement agreements unless the estimated revenues for the year from the five (5c) cents gasoline tax and the motor vehicle license fees are certified to be sufficient for the stated purposes of the Highway Department, including "the maintenance of all highways in the State Highway System". (Section 2510, Code of 1932). The 1940 Act under discussion undertakes to amend this section by adding an *additional purpose* to the levy, viz: to pay the State deficit and the general expenses of the State for the fiscal year beginning July 1, 1940.

The motor vehicle license fees are levied by various statutes enacted prior and subsequent to 1929. These statutes are found in Code, Sections 5893 *et seq.,* as part of the codification of the law providing for the State Highway System, and the construction, operation, maintenance and financing of the same.

Section 5893 of the Code provides that the fees are levied "in order to provide funds for carrying out the provi-

sions of this article". The 1940 Act here involved attempts to amend this section by adding an *additional purpose* to the levy, to wit, to pay the State deficit and the general expenses of the State.

Section 5969 of the Code (Acts 1929, page 670 approved March 14, 1929), provides that "The entire amount of the revenues" collected after the enactment of the Acts constituting Chapter 127 of Title 32 of the Code from the five (5c) cents gas tax and the motor vehicle license fee shall be paid over to or held by the State Highway Department, "and paid out as provided in this section". The section then provides for the disbursement of the funds in the order stated, for (1) costs of administration, etc., not exceeding $450,000.00 annually (2) maintenance of debt service on (a) State Highway Certificates of Indebtedness, and (b) reimbursement agreements (3) sinking fund payments; (4) road maintenance; (5) road construction and other purposes.

The 1940 Act attempts to amend Section 5969 interposing between sinking fund payments and road maintenance an additional purpose to which the revenues in question shall be applied, to wit, the payment of the State deficit and the general expenses of the State.

Other provisions of the 1940 Act require the Highway Department to revise its budget for 1940, and to make provision therein and in the budget for 1941 for the payment of the $2,000,000.00 as directed by the Act.

For the purposes of the present discussion, it will be perceived that the effect of the Act is to subordinate road maintenance in 1940 and again in 1941, to the payment of $1,-000,000.00 each year to the State deficits. And it is to be considered that if in this respect the Act is constitutional, the General Assembly in 1941, and in subsequent years, may further encroach upon the revenues derived from the five (5c) cents gasoline tax and the motor vehicle license fees

until the whole amount of money allocated for road maintenance has been consumed.

Thus road maintenance, one of the named *objects* of the Act of 1929, imposing the revenues in question, would be obliterated, leaving to general taxation the protection of the State's huge investment in roads by proper maintenance. This could not have been in legislative contemplation when the gasoline tax was levied at its present rate, or in the contemplation of this Court when it sustained the validity of the 1929 Act providing for the expenditure of such a huge sum of money (including the annual bond sales as bonds are paid) to complete the constantly expanding highway system.

At the outset of our consideration of the specific grounds upon which the Act of 1940 is alleged to be unconstitutional, we must take into account our decision in the case of *State ex rel. Edwards v. Osborne et al.*, 193 S. C., 158, 7 S. E. (2d), 526 (we will hereinafter refer to this case as the *Edwards case*).

In that case we held Sections 99 and 100 of the Appropriation Act for 1939 (Acts 1939, page 649) unconstitutional. Section 100 of that Act undertook to appropriate $454,000.00 of the "current revenues derived from the five cents gasoline tax and the motor vehicle license tax * * * to the general fund of the State" to be used for the general expenses of the State for the ensuing fiscal year.

The petitioners contend that our decision in the *Edwards case* on Section 100 of the 1939 Act, is controlling here. The respondents have not asked leave of the Court to criticize that case or to contend that it should be overruled. On the contrary, both the Attorney General and the special counsel for the respondents recognize the soundness of the decision in the *Edwards case,* but they seek to differentiate it on the ground of the differences between the statute there involved and the 1940 Act.

The whole of the statutory provision, Section 100, declared unconstitutional in the *Edwards case,* is as follows:

"Section 100. The State Highway Department is hereby authorized and directed to pay from its current revenues derived from the five cents gasoline tax and the motor vehicle license tax the sum of $454,000.00 to the State Treasurer, which amount shall be credited to the general fund of the State and used for the general expenses of the State for the fiscal year commencing on the first day of July, 1939, the said payment to be made at such time as may be agreed upon by and between the State Highway Department and the State Treasurer."

The grounds upon which this statutory provision was attacked in the *Edwards case* include the three grounds, hereinafter stated, upon which the 1940 Act is attacked.

In the *Edwards case* we deemed it unnecessary to pass upon the contention that the 1939 Act impaired the obligation of the contract between the State and the holders of the outstanding State Highway Certificates of Indebtedness, and we held the Statute to be unconstitutional on the grounds that it violated Sections 2 and 3 of Article X of the Constitution of South Carolina. Specifically, our rulings in that case as to the two constitutional provisions referred to were as follows:

The appropriations made in 1939 Appropriation Bill exceeded the estimated revenues from the taxes provided by that Bill and otherwise imposed by law about $2,000,000.00. The applicable constitutional provision was stated to be Article X, Section 2, of the Constitution of 1895, which is as follows:

"Section 2. *Expenses of State Government.*—The General Assembly shall provide for an annual tax sufficient to defray the estimated expenses of the State for each year, and whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year the General Assembly shall provide for levy-

ing a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year."

So that when the General Assembly, in an effort to balance the budget before enacting the Appropriation Bill, appropriated $454,000.00 from the five cents gasoline tax and the motor vehicle license fees toward the payment of the general expense of the State, it violated the constitutional mandate as to the manner of providing for the payment of State expenses. In other words, it failed to "provide for an annual tax" to defray estimated expenses.

As we said on this point in the *Edwards case:*

" * * * The certificates of indebtedness presently involved, and the $454,000.00 fund appropriated from highway revenues, admittedly represent a deficit in the revenues of the State under appropriations made for the fiscal year beginning July 1, 1939. The Legislature failed to follow the constitutional injunction to 'provide for an annual tax sufficient to defray the estimated expenses of the State for each year'. Instead of doing that, it levied taxes (including all sources of revenue imposed) in an amount that was insufficient by approximately $2,000,000.00 to comply with the constitutional requirements. To meet this known and anticipated deficit it resorted to funds already appropriated to special purposes.

"The highway certificates of indebtedness being payable primarily out of the same special revenues from which the $454,000.00 would come, it is seen that the appropriations thus attempted to be made constitute a diversion of funds that have already been appropriated, and already partly collected for definite public purposes. It is, of course, not questioned that in any year the Legislature could impose gasoline taxes or motor vehicle license fees as part of the taxes to be collected for the ensuing year, with which to meet the current expenses of the State for that year. But when the funds to which the Legislature resorts, though tax rev-

enues in a legal sense, have already been appropriated and in part collected, it is utterly unsound to say that the diversion of such funds, from the purposes for which they were appropriated, to the payment of current expenses, is the same thing as the exaction of an annual tax to defray the expenses of the State for each year."

But the 1940 Act carries a further defect under this provision of the Constitution (Article X, Section 2), that is not contained in the 1939 Act.

There are two distinct constitutional mandates here. The one primarily dealt with in the *Edwards case* is the requirement that "The General Assembly should provide for an annual tax sufficient to defray the estimated expenses for the State for each year." The further requirement is that " * * * whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year, the General Assembly *shall provide for levying a tax* for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year." (Italics added.)

Under these explicit and mandatory provisions, the deficit for the year ending June 30, 1940, could be met in only one way—by the *levying of a tax,* which the 1940 Act does not do. The gasoline tax was *levied* in 1929. The motor vehicle license tax was levied by successive statutes prior to 1940. What the 1940 Act does is to *appropriate* tax money that was levied by prior legislation.

This is not a case where tax money which was so levied as to become general funds of the State, without specific allocation, is subsequently *appropriated for* and *allocated to* specific purposes, free of any applicable constitutional limitations, as was the case with the funds involved in the case of *Crawford v. Johnston,* 177 S. C., 399, 181 S. E., 476. In the present case we are dealing with a constitutional direction as to the method of meeting a deficit, and with a statute

that disregards the constitutional requirement of levying a tax, and in its stead appropriates tax money which had been previously levied and appropriated.

Disregarding the question of the applicability of the constitutional limitations, if the General Assembly had levied a separate tax of one cent per gallon on gasoline for general State purposes, and in the same Act or in a subsequent Act had *appropriated* the proceeds to the payment of the deficit, we would have a clear case of compliance with the constitutional method of meeting a deficit. But in the present case, the tax money is not part of the general funds of the State; it is not *levied* by the 1940 Act; it is a tax fund previously *levied* for the stated purposes of the highway department, and *appropriated* by the 1940 Act for wholly different purposes.

Further, the 1940 Act disregards the mandate contained in Article X, Section 2, by admittedly failing, even by the attempted appropriation of $2,000,000.00 from the highway department funds, to provide a sum sufficient to meet the deficit, and to pay the estimated expenses of the ensuing year. On the contrary, payment of the $2,000,000.00 would leave a deficit of a considerable sum in the accounts for the fiscal year, 1940-1941.

It is elementary that where the constitution prescribes a method for legislative action, this method (in this case, meeting a deficit) is exclusive. *Duncan v. City of Charleston,* 60 S. C., 532, 39 S. E., 265; *Simms v. Sawyer,* 101 S. E. (W. Va.), 467, 469; 16 C. J. S., 122; 11 Am. Jur., Constitutional Law, Section 57, page 667.

As is well stated in the brief of petitioners:

"The rule is an application of the maxim *expressio unius est exclusio alterius,* and because of the fundamental principle that the legislative power is unlimited, except to the extent that it is circumscribed by the Constitution, the maxim is nowhere applied with greater strictness than in the con-

finement of the Legislature to any method of constitutional action which is prescribed by the Constitution."

That the 1940 Act does not *levy a tax* in a constitutional sense is made clear by the authorities. *Crawford v. Johnston, supra; Rice v. Shealy,* 71 S. C., 161, 50 S. E., 868; *Morton, Bliss & Co. v. Comptroller General,* 4 S. C., 430, words and phrases Pern. Ed. p. 8 *et seq.,* title "Levy (Taxes)".

In the case of *Rice v. Shealy et al., supra,* this Court said:

"In *Morton, Bliss & Co. v. Comptroller General,* 4 S. C., 430, 453, the Court says: 'The duty enjoined on the Legislature is to "levy a tax".' A tax is the means by which a burden primarily borne by the State is transferred to the citizen  *  *  *. Three things are essential to a tax, as that term is understood by our Constitution: First, the ascertainment of a sum certain, or that can be rendered certain, to be imposed on the collective body of taxpayers; second, a legal imposition of that sum as an obligation on the collective body of taxpayers; third, an apportionment of such sum among individual taxpayers so as to ascertain the part or share that each should bear.  *  *  *  The first two acts above described, namely, the ascertainment of a sum to be imposed on the collective body of taxpayers, and its imposition by a legislative declaration to that effect, are essentially legislative acts or acts proper, directly to the law-making function of the government.  *  *  *  The third act, namely, the apportionment of the whole sum imposed by way of tax on the collective body of taxpayers upon the separate individuals composing that body, is usually an administrative act performed under specific statutory directions, ascertaining the mode and time of its performance  *  *  *."

Prior thereto, this Court had stated in *Morton, Bliss & Co. v. Comptroller General, supra,* at page 455, the following:

"  *  *  *  A tax is said to be levied when the amount or rate to be imposed is fixed by law, for what is wanting to

complete such levy is supplied by the standing tax laws, and consists in a course of administrative action. When the levying of a tax is spoken of as a legislative act, it is commonly understood to describe such action on the part of the Legislature as would, with the standing tax laws, complete the Legislative authority requisite to enable the administrative department to distribute and collect the tax."

The 1940 Act does none of the three things thus specified, while on the other hand, the pre-existing laws do all three of them.

Article X, Section 3 of the Constitution, provides:

"Section 3. *Tax Shall be Levied in Pursuance of Law.* —No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied."

Applying this provision to the 1939 statute, this Court said in the *Edwards case:*

"Under the provisions of Sections 5969 and 5970 of the Code (taken from the Act of 1929), 'the entire amount of the revenues derived from the gasoline tax and the motor vehicle license tax' are required to be turned over to and to be held by the State Highway Department for the purposes enumerated in these sections, the principal of such purposes being to comply with reimbursement obligations, and to pay the principal and interest on the State highway certificates of indebtedness.. The remainder of such revenues is appropriated for the maintenance of the State highway system, and for the construction of new highways.

"In Sections 2507 and 2508 of the Code it is provided that five cents per gallon of the gasoline tax 'shall be turned over to the State Highway Department for the purposes of said department.'

"Thus we have a constitutional direction that a law which levies taxes shall distinctly state the object of the same, to which object the tax shall be applied; and a statutory imposition of a tax on gasoline and motor vehicles for the

construction and maintenance of highways, and for the payment of the principal of State highway certificates of indebtedness, and the interest accumulating thereon.

"In this situation, Sections 99 and 100 the 1939 Act nevertheless authorize the diversion of revenues collected for a specific purpose to entirely different purposes, to wit, the payment of the current expenses of the State for the fiscal year beginning July 1, 1939.

"It may be conceded that the Legislature has plenary power in connection with the imposition of taxes to change its mind from year to year as to the purposes to which in each year it will apply the proceeds of particular sources of revenue (in the absence of any question of impairing the obligation of a contract); but under the present constitutional provision it is without power to impose a tax for a particular purpose, and before such purpose has been accomplished, to change its mind and direct the revenues derived from the particular tax to an entirely different purpose."

"We think it may not be questioned that the gasoline tax and the motor vehicle license tax constitute a special fund for the payment of State highway certificates of indebtedness, reimbursement agreements, and the other purposes specified in the law, and that this fund is not subject to a process of attrition by occasional or systematic diversion that will deplete the primary source with which to pay the heavy outstanding obligations of the State Highway Department."

With the 1939 Act, and the rulings we made thereon in the *Edwards case* thus in mind, we turn again to the 1940 Act to see wherein the two differ in purpose and effect. (1) The Acts are alike to the extent that they appropriate moneys derived from the five (5¢) cents gasoline tax and the motor vehicle license tax to the payment of general expense of the State. (2) In effect they are alike in that they leave the time of payment of the money during the periods

in question to agreement between the highway department and the State Treasurer. (3) The 1939 Act is an unqualified appropriation out of the designated revenues. It contains no reference to the provisions of the law respecting the use of the revenues that are in effect amended by it. The 1940 Act effects the appropriation by amending in terms the existing ·statutes providing for the uses to be made of the revenues so as to provide an additional use—the payment of the State deficit and the payment of State expenses. This additional use is so interposed as to give priority to the payment of the administrative expenses of the highway department and the maintenance of ·principal and interest payments on the outstanding State highway certificates of indebtedness and reimbursement agreements, and to subordinate road maintenance and road construction to the payment of the appropriation made by the 1940 Act.

From a juridical standpoint, the difference appears to be *nil* as between the two Acts. The fact that the 1939 statute fails to name the Code sections amended by it, and the 1940 statute does specifically point out the sections of the Code amended cannot render the later Act constitutional when both Acts have the identical purpose and effect. It is true that the 1940 Act undertakes to change the priority, as hereinbefore pointed out, but this tends to make the Act all the more objectionable from a constitutional standpoint.

In the case of *Morton, Bliss & Co. v. Comptroller General, supra,* this Court, speaking of the provision of the Constitution of 1868, which was identical with Article X, Section 3 of the Constitution of 1895, said:

" * * * These concluding words, in directing the application that shall be made of the funds resulting from the collection of such a tax, do all that it is the province of an appropriation to do. Should these words be placed in an Act of legislation authorizing the borrowing of money and levying a tax for the payment of interest on the money so borrowed, they would have to be construed as amounting to an

appropriation or authority for the Treasurer to disburse such money towards the objects they were intended to subserve. In that case the object of their insertion in such Act would have to be regarded as identical with that sought to be enforced by the Constitution. If it had been intended that the Legislature should have any discretion as to the objects to which such funds should be applied, this clause would not have been inserted in the Constitution. Its insertion evidences the intent of the Constitution to deprive the Legislature of all power of misapplication, by an authoritative and imperative appropriation to the specific object set forth in the tax law as the ground of raising the specific tax. If the construction of the constitutional provision stopped short of this, it might entirely defeat the intent, for money might be raised by the Legislature under an Act strictly conformable to the Constitution as a mere pretext, and, afterwards, applied to any purpose desired by the Legislature. The ·efficient remedy was a stamp at once upon the fund the direction in which it should be disbursed, and thus effectually to appropriate it in the sense of Section 12 (Article IX) which reads as follows: 'No money shall be drawn from the Treasury but in pursuance of an appropriation made by law.' An appropriation made by the Constitution itself is in every sense an appropriation made by law."

The Attorney General however states the position of the respondents, in distinguishing the *Edwards case* and the 1939 Act, in the manner following:

"The petitioners have fallen into the error of referring to the Act of 1929 (Highway Bond Act) to support their con tention as· to this question instead of looking to the Act of 1940 to guide them in determining the actual appropriation of the funds in question. The Act of 1929 fixes the tax levy on gasoline and the motor vehicle license tax, and definitely provides for payment of certain items but leaves the remainder of such fund to be annually appropriated by certain acts to be performed by the State Highway Commission.

When the Act of 1940 was passed and approved on June 10, 1940, no appropriation of the excess gasoline tax or motor vehicle license tax had been actually made for the year 1941 as the State Highway Commission had not prepared its estimates for the year 1941 as directed by the Bond Act so as to make those estimates actual appropriations for the year 1941. The Legislature specifically appropriated $2,000,000.00 to the State Treasurer of South Carolina, not as a diversion of funds appropriated by the Act of 1929, but a fund appropriated by the Act of 1940 which was, as stated above, an amendment to the Act of 1929."

The *Acts* imposing or levying the five (5¢) cent gasoline tax and the motor vehicle license fees and not the highway department, levy, appropriate and allocate the revenues.

The allocation is made in Section 5969 of the Code, and the highway department merely expends the money on the purposes to which it has been thus allocated. And as held in the *Edwards case* and the cases therein cited, the appropriation is a "continuing appropriation" running on from year to year without further legislative action until the *purpose* for which the levy and appropriation were made has been accomplished.

If the contention of respondents were adopted, we would be declaring in direct violation of Article X, Section 3 of the Constitution, that where a tax is levied by a statute which "distinctly state(s) the object of the same" it is not necessary to apply the proceeds to the "object" so stated.

In the brief of special counsel for the respondents, the 1939 Act involved in the *Edwards case* is sought to be differentiated in this manner:

"(a) It amends Sections 2507, 5893, and 5969 of the 1932 Code, under which the particular taxes were levied and appropriated.

"(b) The proceeds from the gasoline taxes and motor vehicle license fees to be paid over to the State are those accruing *after the adoption of the statute*. No funds collected

from these taxes prior to the adoption of this statute are affected or appropriated.

"(c) The statute does not subordinate any contractual obligations.

"(d) No tax moneys derived under the old statutes are diverted."

Point (a) applies also to the 1939 Act. Points (b) and (d) are contrary to the record and to the terms of the 1940 Act. Sections 2507 and 5893 of the Code, as amended by the 1940 Act, do not limit the amendment of the law to the revenues thereafter collected. They allocate the revenues, including the motor vehicle license fees which were mostly collected in the fall of 1939, in such manner that within about a month after the passage of the Act, the State Treasurer considered it timely to call for the first million dollars of the appropriation, although it could not be suggested that between the date of the passage of the Act and the call for the money the highway department had collected revenues from the gasoline tax and license fees sufficient to meet the requirements of the 1940 law itself, which came ahead of the diversion and to pay the $1,000,000.00. And in Section 5969 of the Code, the language "from and after the approval of this chapter" clearly refers to the enactment of the 1929 legislation, which principally composes "this chapter". As we said of the 1939 Act in this respect in the *Edwards case:* "Nor can it be said that the $454,000.00 fund sought to be diverted to State expenses represents taxes imposed for the fiscal year 1939-1940, because obviously that fund was payable at any time beginning July 1, 1939."

Point (c) is rendered immaterial by the fact that we do not deal with the impairment of contract feature, to which that point applies.

Counsel for the respondents make the further point that the contentions of petitioners are tantamount to a denial of legislative power to deal with the gasoline tax and motor vehicle license fees, and with the highway program. They

argue that if it is beyond the power of the General Assembly to change the allocation of any part of the revenues because the highway system has not been completed (that being the constitutional object for which the revenues were imposed), it would follow that by reason of the original statutory allocation of the revenues, they probably could never be used, in whole or in part, for general State purposes, because under changing conditions the State highway program will never be wholly complete. They contend, in this light, that petitioners are in effect resting upon the position that in the enactment of the State Highway Bond Act of 1929, the General Assembly abrogated its power to further legislate on the subject.

This is denied by the petitioners. They point out that the five (5¢) cents gasoline tax and the motor vehicle license fees were imposed in contemplation of the completion of the highway system as then visualized; that the mileage of the system has been increased by thousands of miles of which two thousand miles were added in 1939 and 1940 (Act 1939, page 648, Section 97); and that the outstanding bonded indebtedness is not reduced from year to year as the obligations are retired, but through the annual sale of bonds to the amount of bonds retired, the debt remains constant at $62,300,000.00 (Act 1939, page 649, Section 101). The petitioners say that they recognize that it is within the legislative power to reduce the highway program; to provide for the progressive reduction of the funded debt; and to reduce the five (5¢) cents gasoline tax and the motor vehicle license fees on a comparable basis, leaving the General Assembly free to levy for State purposes, including the deficit, a gasoline tax and license fees to the extent of the reduction or more, subject only to the limitations of the constitutional inhibition against the impairment of the obligation of contracts.

We need not deal in detail with these opposing contentions further than to say that this case presents no question as to

the abrogation of legislative powers. What we are confronted with is a direct disregard of constitutional directions and limitations. These were imposed by a power higher than the General Assembly or this Court and must be observed by both of the latter.

Nor do we see any merit in the contention of respondents that the Act of 1940 should be construed as directing the highway department to curtail or limit its construction projects to the extent of leaving $2,000,000.00 available to pay over to the State. That view begs the issue as to the constitutional provisions hereinabove discussed. It is a matter of simple mathematics, on the figures furnished by both petitioners and respondents, that most of the construction program of the highway department is paid for out of federal aid money and the proceeds of bond sales. When highway maintenance is recognized, as it must be, as one of the objects for which the five (5¢) cents gasoline tax and the motor vehicle license fees were levied, it is seen that within the period during which the $2,000,000.00 must be paid under the 1940 Act, there won't be anything like the required sum in the hands of the highway department to pay over to the State.

Since the pleadings admit that but for the restraint imposed by this suit, the money would be paid over as directed, it is apparent that the payment would have represented a diversion of money which under the decisions of this Court in the case of *State ex rel. Richards v. Moorer,* 152 S. C., 455, 150 S. E., 269, and in the several cases that have followed it, constituted a "Special fund" for the several purposes set forth in the State Highway Bond Act of 1929.

It is apparent that the Act of 1939 (held unconstitutional in the *Edwards case*) and the Act of 1940, here involved, differ only in the *manner* in which the appropriation is *phrased.* Under each Act, the *stated* purpose and the sole object of the legislation is to divert part of the proceeds of the five (5¢) cent gasoline tax and the motor vehicle li-

cense fees to the State deficit and payment of State expenses. To hold that when one Act amends the pre-existing law without referring to such law, it is in violation of Sections 2 and 3 of Article X of the Constitution, and that another statute or Act which has for its single object the same effect and purpose is not in violation of these constitutional provisions, because such Act does make direct reference to the pre-existing law in attempting to amend same, would indeed be placing this decision on more than shadowy ground.

Much of the argument for both the petitioners and respondents is taken up with the question whether the 1940 Act impairs the obligation of the contract between the State and the holders of the outstanding State Highway Certificates of Indebtedness within the meaning of the applicable provisions of the Constitutions of the United States and the State of South Carolina. In view of the rulings we have made under the provisions of Article X of our Constitution, it is not necessary to pass on this issue.

It is regrettable that with the rulings of this Court in the *Edwards case* before it, the General Assembly undertook to meet the State deficits in a manner that contravenes the constitutional limitations hereinbefore referred to; those limitations and our rulings thereon in the *Edwards case* are so clearly applicable to the 1940 Act that our task has resolved itself into the duty of merely declaring the binding force of constitutional restrictions that in terms govern the General Assembly in the handling of the fiscal problems of the State.

It is the judgment of this Court that the Act of 1940, No. 1019, approved June 10, 1940, is unconstitutional for the reasons above set forth. Accordingly, it is

*Ordered,* that the respondents, the Members of the Highway Commission and the Chief Highway Commissioners, be, and they hereby are permanently restrained and enjoined from paying over to the State Treasurer, and that the State Treasurer is hereby permanently restrained and

enjoined from demanding or receiving from the State Highway Commission, and from exercising any dominion over, any part of the sum of two million dollars attempted to be appropriated by said Act.

MESSRS. JUSTICES CARTER, FISHBURNE and STUKES concur.

MR. CHIEF JUSTICE BONHAM concurs in result.

MR. CHIEF JUSTICE BONHAM (concurring in result): Because of the vital importance of the issues involved in this case, I sought to co-ordinate the issues involved with those construed by this Court in the *Edwards case* which grew out of the Act of 1939 (193 S. C., 158, 7 S. E. (2d), 526), which directed the diversion of funds from the highway department to the State Treasurer for the general expenses of the State. In some respects that co-ordination could be made, but there is one insurmountable obstacle which I could not overcome.

Section 2 of Article 10 of the Constitution of 1895 provides that:

*"Expenses of State Government.*—The General Assembly shall provide for an annual tax sufficient to defray the estimated expenses of the State for each year, and whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year the General Assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year."

The Act of 1940, which is under construction in the present case, undertakes to provide for the deficiency in the income of the State, then existing, by taking from the funds of the State Highway Department certain portions to be turned over to the State Treasurer to meet the expenses of the State. No special tax is levied for this purpose, but it is argued that the funds derived from the gasoline tax and the motor license fees are derived from a tax levied by the

General Assembly, but these are funds derived from a tax the proceeds of which are already pledged to the payment of an obligation created by statute, and the Act does not conform to the provisions of the Constitution above quoted which relates to the levying of a tax to meet a deficiency in the annual budget as passed by the General Assembly.

The Act of 1940 is unconstitutional and, hence, I concur in the result of the main opinion.

It is a matter for the consideration of the General Assembly and hence this Court may not pass upon it, but I, I speak for myself alone, do not hesitate to say that I do not think the Highway Commission has the right to use funds derived from the tax on gasoline and the fees for licenses to pay the obligations due to holders thereof, and immediately re-issue such obligations. This is, in my opinion, contrary to the spirit of the Act which creates the obligations. By this practice the debt is not reduced and may be continued in force indefinitely.

I concur in the result of the main opinion.