THE STATE OF WASHINGTON, on the Relation of *Washington Toll Bridge Authority, Plaintiff*, v. CLIFF YELLE, *as State Auditor, Respondent*, THE WASHINGTON STATE FINANCE COMMITTEE *et al., Intervenors.*\*

*Reported in 377 P. (2d) 466.

*The Attorney General, Weter, Roberts & Shefelman, Harold S. Shefelman, Thomas R. Garlington,* and *Elvin J. Vandeberg, Special Assistants,* for plaintiff and intervenors.

*The Attorney General, Dore, Dubuar & Dore* and *Fred H. Dore, Special Assistants, David C. Cummins, Assistant,* and *James M. Morris,* for respondent.

This is an original mandamus application to compel the State Auditor to sign refunding bonds for (1) "The Washington State Ferry System Refunding Revenue Bonds, 1955," and (2) "The Washington Toll Bridge Authority, Ferry and Hood Canal Bridge Revenue Bonds, 1957."

The total original face value of the two issues was $40,-500,000, of which $37,920,000 is unpaid. In order to avoid impending default, the legislature of 1961 chose to refund both issues. While retaining the original plan of payment from tolls, a new fund denominated "The Puget Sound Reserve Account" was established, from which temporary loans were sanctioned.

Pursuant to Laws of 1961, Ex. Ses., chapters 7 and 9, pp. 2551 and 2569, by resolution No. 362, the Toll Bridge Authority authorized a bond issue of $38,000,000 to refund both issues, which bond the State Auditor refused to sign. This proceeding seeks to compel him to perform that statutory duty.

We find the ten arguments advanced by the auditor in support of his refusal to be without merit.

■ We are met at the threshold by respondent's contention that "he is not that member of the Authority who is required by law and Resolution No. 362 to sign the proposed bonds." No useful purpose would be served by restating, even in abridged form, the respondent's supporting argument for it is sufficient to say that RCW 47.60.060 requires the member of the Toll Bridge Authority who is State Auditor to sign the bonds, and that the auditor is a member of that agency, albeit by the Governor's appointment. The constitution, by Art. 4, § 4, confers original jurisdiction in mandamus on the Supreme Court to all state officers. The objection is devoid of merit.

The title of the Laws of 1961, Ex. Ses., chapter 7, p. 2551, is:

"AN ACT Relating to revenue and taxation; increasing the motor vehicle fuel tax, the use fuel tax and motor vehicle license fees, gross weight fees, fees in lieu of gross weight fees, seating capacity fees, providing for the distribution of said revenue; establishing an urban aid account in the motor vehicle fund; establishing a Puget Sound reserve account; providing for the use of the urban aid account and the Puget Sound reserve account; authorizing investment of the Puget Sound reserve account; . . . [amending and repealing certain designated sections of prior statutes]; providing effective dates; and declaring an emergency."

Respondent makes two contentions that the statute is in violation of Art. 2, § 19, of the constitution,[1] which prohibits the enactment of a statute containing more than one subject, which must be expressed in the title. Respondent argues that (1) three subjects are included in both the title and body of the act, and (2) one subject in the title is not included in the body.

■ In considering such claimed defects, it is well to remember that the constitutional provision is an admonition

---

[1] "No bill shall embrace more than one subject, and that shall be expressed in the title." Art. 2, § 19, Washington Constitution.

addressed to the legislature and such objections do not involve any invasion of private rights. It was explained in *Holzman v. Spokane,* 91 Wash. 418, 420, 157 Pac. 1086, as follows:

" . . . The doctrine that all reasonable doubts as to the constitutionality of an act of the legislature should be resolved in favor of upholding the act has peculiar force in the solution of the question of whether or not the act has been in form constitutionally passed, because such a constitutional question has to do with legislative procedure. In other words, it has to do with the methods of transacting public business by a co-ordained branch of the state government, and not with those constitutional guaranties of personal rights which it is the peculiar province of the courts to protect."

The respondent contends that the subjects of revenue and taxation are unrelated to the Puget Sound reserve account. Resort is had to dictionary definitions of the terms from which the conclusion is drawn that such relationship is lacking. This but exemplifies the comment of a great jurist that it is misleading to make a fortress out of the dictionary in an attempt to interpret statutes.[2]

■ The general subject in both the title to chapter 7 and in the body of the act is revenue and taxation. The distribution of the tax and the creation of the Puget Sound reserve account are integral parts of the scheme. Respondent's argument is a mere assertion to the contrary. The simultaneous creation of a special account, for the distribution of the proceeds of a tax in the act imposing it, is a common legislative device and has been held to be germane to the title of an act relating to revenue and taxation. *Commonwealth ex rel. Bell v. Powell,* 249 Pa. 144, 94 Atl.

---

[2] " . . . Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. . . . " Hand, J., *Cabell v. Markham,* 148 F. (2d) 737.

746; *Winter v. Barrett,* 352 Ill. 441, 186 N. E. 113, 89 A. L. R. 1398. It was said by the Supreme Court of Indiana in *State ex rel. Test v. Steinwedel,* 203 Ind. 457, 467, 180 N. E. 865:

". . . Section 19, Art. 4 does not by restricting the contents of an 'act' to one subject, contemplate a metaphysical singleness of idea or thing, but rather that there must be some rational unity between the matters embraced in the act, the unity being found in the general purpose of the act and the practical problems of efficient administration. It is hardly necessary to suggest that matters which ordinarily would not be thought to have any common features or characteristics might, for purposes of legislative treatment, be grouped together and treated as one subject. For purposes of legislation, 'subjects' are not absolute existences to be discovered by some sort of *a priori* reasoning, but are the result of classification for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act. . . ."

The Puget Sound reserve account is embraced within the general subject of revenue and taxation.

However, the main argument in support of the claim that chapter 7 violates the single subject and title limitations of the constitution is that the Senate was misled by the inclusion in the title of the words "establishing an urban aid account in the motor vehicle fund" while no such provision is in the body of the act. Respondent resorts to the printed bill and entries in the legislative journals to establish that the Senate was misled because the bill, as it originally passed the Senate, created an urban aid account which was stricken by house amendment without changing the title, so that the Senate accepted the house amendments in the belief that the urban aid provisions remained in the bill.

The short and simple answer is that we will not embark upon such an investigation because the enrolled-bill doctrine, long a citadel in our law, forbids, and matter embraced in the title not included in the body of the act is disregarded as surplusage. *Whitfield v. Davies,* 78 Wash. 256, 138 Pac. 883; *State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 Pac. 1047.

Again we decline to discard the enrolled-bill rule and substitute in its place the journal-entry rule. It is just short of 70 years since the enrolled-bill doctrine was first announced in *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201. That case is extraordinarily persuasive because it was written by Judge Hoyt, who, but 4 years earlier, had served as President of the Constitutional Convention. It is unnecessary to repeat the arguments for and against each theory because they are adequately summarized in *Derby Club, Inc. v. Becket,* 41 Wn. (2d) 869, 252 P. (2d) 259, and *Roehl v. Public Util. Dist. No. 1,* 43 Wn. (2d) 214, 261 P. (2d) 92.

The matter was simplified by Judge Mackintosh in *State ex rel. Dunbar v. State Board of Equalization,* 140 Wash. 433, 249 Pac. 996, in a single sentence:

" . . . Finding an enrolled bill in the office of the secretary of state, unless that bill carries its death warrant in its hand, the courts will make no investigation of the antecedent history connected with its passage, except as such an investigation may be necessary in case of ambiguity in the bill for the purpose of determining the legislative intent. . . . "

The enrolled bill is fair on its face and carries its own passport to validity, which is impervious to collateral attack.

The first of five arguments that Laws of 1961, Ex. Ses., chapter 9, p. 2569, violates Art. 2, § 37, of the state constitution in amending existing law without complying with the constitutional formula is that it amends RCW 47.60.140,[3] which requires the toll bridge bonds to be paid solely from tolls.

Chapter 9 does not relieve the toll revenues from

[3]"The authority is empowered to operate such ferry system, including all operations, whether intrastate or international, upon any route or routes, and toll bridges as a revenue producing and self-liquidating undertaking. The highway commission shall have full charge of the construction, rehabilitation, rebuilding, enlarging, improving, operation and maintenance of the ferry system, including toll bridges, approaches and roadways incidental thereto that may be authorized by the authority, including the collection of tolls and other charges for the services and facilities of the undertaking . . ." RCW 47.60.140.

the burden of the complete payment of the bonds plus interest because the authorized loans from the Puget Sound reserve account must be repaid. Attention was directed to this circumstance in *State ex rel. Hoppe v. Meyers*, 58 Wn. (2d) 320, 363 P. (2d) 121.

The legislature has, from the very beginning, insisted that such bonds should be paid solely by tolls. Those bonds are not general obligations of the state. That is the inherent character of revenue bonds. The original provision of Laws of 1949, chapter 179, § 4, p. 489, 490, made this perfectly clear. The language of the act is:

". . . Each such revenue bond shall contain a recital that payment or redemption of the bond and payment of the interest thereon is secured by a direct charge and lien upon the tolls and revenues pledged for that purpose and that such bond does not constitute an indebtedness of the State of Washington. . . ."

But the legislature at the same time recognized that there would be emergencies requiring temporary advances. The same section authorized the Toll Bridge Authority to include interest on the bonds during the construction period and for 6 months thereafter, but required repayment.

". . . All such costs and expenses as well as any thereof heretofore incurred shall be reimbursed to said Motor Vehicle Fund out of any proceeds derived from the sale of bonds or out of tolls and revenues to be derived by the Authority through its operations hereunder." Laws of 1949, chapter 179, § 4, p. 489, 492.

Laws of 1961, Ex. Ses., chapter 9, § 3, p. 2570,[4] specifically requires repayment to the motor vehicle fund of all advances made from the Puget Sound reserve account. Neither act abandons the requirement that the bonds and interest thereon ultimately be paid from tolls. Neither act makes them general obligations of the state.

---

[4]"Any moneys from the Puget Sound reserve account used by the authority to pay such obligations shall be repaid by the authority to the motor vehicle fund from tolls of the Washington state ferry system and the Hood Canal bridge and tolls shall be continued for any required additional length of time necessary for this purpose." Laws of 1961, Ex. Ses., chapter 9, § 3, p. 2570.

Respondent contends that chapter 9, § 2, which creates the ferry improvement fund, is "contrary to the self-liquidating unit-financing scheme authorized in RCW 47-.60.140-.160" and that this section amends chapter 7, §§ 18 and 20, "which do not contemplate that the Puget Sound reserve account shall be used to insure payments into the ferry improvement fund."

But this argument overlooks the plain terms of chapter 9, § 2, which limits the annual amount to $250,000 and specifies that it shall be allocated only after all other charges during the year have been met.

In a seven line paragraph, respondent's brief argues that chapter 9, § 5, eliminates the requirement that it shall be self-liquidating. We find the argument to be devoid of substance because of the plain mandate that all loans must be repaid.

Respondent argues that chapter 9, §§ 5 and 6, amend the existing statutory provision respecting tolls and bridges. We find no substantial change in the scheme, but, in any event, if minor changes can be discovered, chapter 9 is a complete act and, therefore, impervious to the charge that it violates Art. 2, § 37. *State ex rel. Washington Toll Bridge Authority v. Yelle,* 56 Wn. (2d) 86, 351 P. (2d) 493; *State ex rel. Port of Seattle v. Department of Public Ser.,* 1 Wn. (2d) 102, 95 P. (2d) 1007; *State ex rel. Hansen v. Salter,* 190 Wash. 703, 70 P. (2d) 1056; *In re Peterson's Estate,* 182 Wash. 29, 45 P. (2d) 45; *In re Hulet,* 159 Wash. 98, 292 Pac. 430; *Swanson v. School Dist. No. 15,* 109 Wash. 652, 187 Pac. 386; *State ex rel. Hunt v. Tausick,* 64 Wash. 69, 116 Pac. 651.

Respondent argues that the ferry improvement fund is likewise a violation of the constitutional one-subject limitation.[5] Chapter 9, § 2, creates a ferry improvement fund but limits the annual diversion into it to $250,000. Respondent is mistaken in asserting that it is for the general pur-

---

[5]Professor Millard H. Ruud of the faculty of the University of Texas Law School has made an exhaustive study of this question. It is published in 42 Minn. L. Rev. 389 (1958).

pose of constructing or bettering the ferry system. The Toll Bridge Authority had that power from the time of acquisition of the ferry system. It is granted by RCW 47.60.010, and was originally Laws of 1949, chapter 179, § 1. Thus it is that the Toll Bridge Authority had the power to improve, better and expand the ferry system at the time chapter 9 was enacted. It needed no new power and no new power was conferred. Chapter 9, § 2, merely creates a fund which will insure the efficient operation of the system in the future, and is germane to the financing of toll bridges and ferries which is the subject of the legislation, and it is adequately reflected in the title.

It is a matter of common knowledge that the ferry system was purchased and the Hood Canal toll bridge was built with the proceeds of revenue bonds. *State ex rel. Washington Toll Bridge Authority v. Yelle,* 56 Wn. (2d) 86, 351 P. (2d) 493. It is, likewise, a matter of common knowledge that interest payments are frequently in jeopardy. With both the financial and judicial history of the problem freshly in mind, an informed legislature dealt with the problem in Laws of 1961, Ex. Ses., chapter 9, p. 2569, and endeavored to put the outstanding revenue bonds upon a sound financial basis by eliminating the possibility of default. There is such an intimate relationship between the public highways and the revenue bonds for both ferries and toll bridges that the refunding of such bonds is a single legislative purpose. The possible default of the revenue bonds of 1955 and 1957 was a matter of grave concern when the 1961 legislature convened in extraordinary session. It exercised an informed judgment that it would be in the public interest to consolidate them into a single refunded issue, which is authorized by chapter 9.

Under Laws of 1949, chapter 179, § 4 (RCW 47.60.060), the Toll Bridge Authority is vested with power to issue bonds upon such conditions as it deems necessary.[6] That

[6]Laws of 1949, chapter 179, § 4, p. 489, 491, provides:

" . . . The Authority is hereby empowered to include in any resolution authorizing the issuance of the bonds such covenants, stipu-

portion of chapter 9 dealing with parity bonds limits, rather than expands, the Toll Bridge Authority's power to issue such bonds, which, nevertheless, still require future legislative approval. The only bond issue authorized by chapter 9 is one to refund the 1955 and 1957 issues. Thus it is that the act in question is not general legislation within the principle enunciated in *State ex rel. Washington Toll Bridge Authority v. Yelle*, 56 Wn. (2d) 86, 351 P. (2d) 493, that a general purpose may not be commingled with a single or special purpose in the same act.

The respondent contends that chapter 9, § 2, authorizes the Toll Bridge Authority to improve and expand the ferry system by use of the ferry improvement fund. This is not so. Such power is conferred by RCW 47.60.010, while the act in question merely provides for the financing of the system which is not expanded or enlarged by it. It is not general legislation because its operation is limited to the refunding of existing bond issues.

Respondent further contends that the inclusion of an appropriation in chapter 9 is, likewise, a violation of the double-subject prohibition of the constitution. Of course, this appropriation is not of a continuing nature, and its object is to carry into execution the principal purposes of the act.

Respondent claims that chapter 9 is not complete in itself. The respondent's argument is that chapter 9, in sanctioning the use of tax money if the revenue from tolls is insufficient to pay the accruing bond issues, is amendatory of RCW 47.60.113 and RCW 47.60.115, which provide that the bonds shall be payable exclusively from tolls. Respondent asserts that such was the decision in *State ex rel. Washington Toll Bridge Authority v. Yelle*, 54 Wn. (2d) 545, 342 P. (2d) 588.

---

lations and conditions as may be deemed necessary with respect to the continued use and application of the income and revenues from the undertaking. . . ."

Compare with codified section RCW 47.60.060, Laws of 1961, chapter 13, p. 469.

In this contention the respondent is mistaken.[7]

Chapter 9, § 3[8], merely authorizes the temporary borrowing from the Puget Sound reserve account of such funds as may be necessary to make payments of bond principal and interest and specifically requires the repayment of all amounts so borrowed. This was emphasized in *State ex rel. Hoppe v. Meyers, supra.* It is an interim expedient to preserve the integrity of the issue while requiring the ultimate payment to be made from the funds derived from the tolls.

The argument is made that Laws of 1961, Ex. Ses., chapter 9, p. 2569, is invalid because it violates Art. 2, § 19, of the state constitution. The argument is that it embraces

---

[7]This was explained in *State ex rel. Washington Toll Bridge Authority v. Yelle,* 56 Wn. (2d) 86, 90, 351 P. (2d) 493:

"On the previous application, the mandate was refused because the statutory provisions authorizing the pledging of tax revenues to guarantee the payment of principal and interest on toll bridge bonds could not constitutionally be incorporated in the supplemental appropriation act of 1959. . . ."

[8]"To the extent that all revenues from Washington state ferry system and the Hood Canal bridge available therefor are insufficient to provide for the payment [of] principal and interest on the bonds authorized and issued pursuant to this act and for sinking fund requirements established with respect thereto and for payment into such reserves as the authority shall have established with respect to the securing of such bonds and for payment into the ferry improvement fund, there is hereby imposed a first and prior charge against the Puget Sound reserve account of the motor vehicle fund created by chapter . . . ., Laws of 1961, extraordinary session (Senate Bill No. . . . .) and, to the extent required, against all revenues hereafter derived from the one-quarter cent of motor vehicle fuel tax and one-quarter cent of use fuel tax required by law to be deposited in the Puget Sound reserve account.

"To the extent that the revenues from the Washington state ferry system and the Hood Canal bridge available therefor are insufficient to meet required payments of principal and interest on bonds, sinking fund requirements and payments into reserves and the payments into the ferry improvement fund provided in section 2 of this act, the authority shall use moneys in the Puget Sound reserve account for such purpose. Any moneys from the Puget Sound reserve account used by the authority to pay such obligations shall be repaid by the authority to the motor vehicle fund from tolls of the Washington state ferry system and the Hood Canal bridge and tolls shall be continued for any required additional length of time necessary for this purpose." Laws of 1961, Ex. Ses., chapter 9, § 3, p. 2570.

two subjects, bridges and ferries, and is based upon our decision in *State ex rel. Washington Toll Bridge Authority v. Yelle,* 32 Wn. (2d) 13, 200 P. (2d) 467, which, however, we do not find of controlling importance because the statute there under consideration, Laws of 1945, chapter 266, p. 858, purported to amend Laws of 1937, chapter 173, p. 654, which dealt solely with toll bridges, whereas the amendatory act, both in the title and in the body thereof, dealt with ferries in addition to toll bridges. The purpose of the 1945 amendment was to enable the state to purchase the ferries. The decision is no more than that such legislative purpose cannot be achieved by the amendment of an act limited to toll bridges.

At the ensuing legislative session in March of 1949, following the filing on December 4, 1948, of *State ex rel. Washington Toll Bridge Authority v. Yelle,* 32 Wn. (2d) 13, 200 P. (2d) 467, the legislature enacted Laws of 1949, chapter 179, p. 487, which dealt with both toll bridges and ferries in a single act, both of which were referred to in the title[9]. No suggestion has ever been made that the legislature could not, in an independent act, deal with both toll bridges and ferries as a single operational unit. Under Laws of 1949, chapter 179, § 1, p. 487, the state acquired the Puget Sound ferry system. That section deals with both toll bridges and toll ferries, and was codified by the legislature in Laws of 1961, chapter 13, p. 469. The legislature has continuously considered toll bridges and ferries as a single operational unit for legislative purposes since 1949. Both form an integral part of the state highway system and cannot be regarded as separate subjects within Art. 2, § 19, of the state constitution. *Gross v. Washington State Ferries,* 59 Wn. (2d) 241, 367 P. (2d) 600; *Jeff Hunt Mach. Co. v. South Carolina State Highway Department,* 217 S. C. 423, 60 S. E. (2d) 859; *Deans v. County of Coconino,* 41 Ariz.

---

[9]"AN ACT authorizing the Washington Toll Bridge Authority to acquire by condemnation or otherwise and to operate a system of ferries and toll bridges incidental thereto or to contract for the operation thereof, and to issue revenue bonds in connection therewith; and declaring an emergency." Laws of 1949, chapter 179, p. 487.

253, 17 P. (2d) 801; *Puget Sound Nav. Co. v. United States,* 107 F. (2d) 73; *Puget Sound Nav. Co. v. Department of Public Works,* 156 Wash. 377, 287 Pac. 52; *Savage Truck Line v. Commonwealth,* 193 Va. 237, 68 S. E. (2d) 510.

Respondent argues that chapter 7, § 21,[10] and chapter 9, § 4[11], are in violation of the fourteenth amendment to our state constitution, the first sentence of which states that the power of taxation shall never be suspended, surrendered, or contracted away. The plaintiff and intervenors rely on *Gruen v. State Tax Comm.,* 35 Wn. (2d) 1, 211 P. (2d) 651, and cases in accord therewith, to support the constitutionality of these sections.

■ We place no reliance on the reasoning of that opinion in arriving at our conclusion that there has been no violation of the constitutional provision to which we have just referred. The eighteenth amendment to our state constitution provides that all excise taxes on the sale, distribution, or use of motor vehicle fuel shall be placed in a special fund to be used exclusively for highway purposes.[12]

---

[10] ". . . Whenever the authority shall have pledged any moneys in said account for the purposes authorized in section 20 of this amendatory act, the state agrees to continue to deposit in the Puget Sound reserve account the motor vehicle fuel taxes and use fuel taxes as provided in sections 1 and 4 of this amendatory act, and further agrees that so long as there exists any outstanding obligations pursuant to such pledge, to continue to impose such taxes." Laws of 1961, Ex. Ses., chapter 7, § 21, p. 2565.

[11] "So long as any bonds issued as authorized herein are outstanding, the state hereby agrees to continue to impose the one-quarter cent of motor vehicle fuel tax and one-quarter cent of use fuel tax required by law to be deposited in the Puget Sound reserve account of the motor vehicle fund." Laws of 1961, Ex. Ses., chapter 9, § 4, p. 2571.

[12] "All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:

"(a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets;

In *State ex rel. Bugge v. Martin*, 38 Wn. (2d) 834, 232 P. (2d) 833, we held that, because of the eighteenth amendment, bonds issued for highway purposes payable out of the special fund created by the amendment did not constitute a state debt within the purview of the state's constitutional debt limitation (Art. 8, §§ 1, 2, and 3), and, by implication, approved that section of the act then before the court (Laws of 1951, chapter 121, § 4, p. 306), which read:

" . . . The proceeds of such excise taxes [on motor vehicle fuels] are hereby pledged to the payment of any bonds and the interest thereon issued under the provisions of this chapter, and the legislature hereby agrees to continue to impose the same excise taxes on motor vehicle fuels in amounts sufficient to pay the principal and interest on all bonds issued under the provisions of this chapter when due."

What justified such a provision in that statute and the provision of similar import in the statutes now before us is that the people of this state—conceiving that excise taxes on the sale, distribution, and use of motor vehicle fuels were, in a very real sense, tolls for the use of the highways—provided, by a constitutional amendment, that such excise taxes should be paid into a special fund for

---

"(b) The construction, reconstruction, maintenance, repair, and betterment of public highways, county roads, bridges and city streets; including the cost and expense of (1) acquisition of rights-of-way, (2) installing, maintaining and operating traffic signs and signal lights, (3) policing by the state of public highways, (4) operation of movable span bridges, (5) operation of ferries which are a part of any public highway, county road, or city street;

"(c) The payment or refunding of any obligation of the State of Washington, or any political subdivision thereof, for which any of the revenues described in section 1 may have been legally pledged prior to the effective date of this act;

"(d) Refunds authorized by law for taxes paid on motor vehicle fuels;

"(e) The cost of collection of any revenues described in this section:

"*Provided,* That this section shall not be construed to include revenue from general or special taxes or excises not levied primarily for highway purposes, or apply to vehicle operator's license fees or any excise tax imposed on motor vehicles or the use thereof in lieu of a property tax thereon, or fees for certificates of ownership of motor vehicles." Washington State Constitution, Art 2, § 40 (amendment 18).

highway purposes only; and, since the state can issue bonds for highway purposes payable from that special fund, the implication is that it can covenant that the excise taxes directed by the constitutional amendment to be paid into the fund will be adequate for the payment and servicing of the bonds.

Respondent contends that chapters 7 and 9 violate the eleventh amendment to the state constitution because, it is said, there is an appropriation extending past the biennium.

In arguments before this court, counsel for the respective parties agreed that each succeeding legislature will be required to enact the necessary appropriation measure, if the bonds are to be serviced.

 While it is a sufficient answer to say that the act does not contain any appropriation extending beyond the biennium, the respondent contends, nevertheless, that, because the state is bound until the bonds are retired, the spirit of the noticed constitutional limitation is violated. However, this overlooks the cardinal principle that state constitutions are limitations of power and not grants. In other words, the state is sovereign and possesses all of the attributes of sovereignty except as limited by the constitution itself.

The Supreme Court of Florida has aptly observed that the respondent's argument would restrict highway development to piecemeal construction.[13] The New Jersey Supreme Court

---

[13]". . . only two courses of action are open to the State Road Department: (1) to build only such portions of public roads as can be constructed from year to year with funds accruing to each of the counties during each fiscal year throughout the life of the amendment, or (2) to wait until such time in the future as there shall be sufficient funds on hand to build such projects in toto.

"Manifestly the pursuit of the first course suggested would result in piecemeal construction of public highways—a course which can hardly be said to be economically sound; while the pursuit of the second might well result in the loss of a link in the state highway system that may be sorely needed at the present for the proper economic expansion of the county affected. Neither course, in our view, would be productive of the results designed to be accomplished by

pointed out the axiomatic principle of constitutional law respecting continuing obligations in a single sentence:

"And it is fundamental in the Constitution that, while the Legislature may within constitutional limits, lay a contractual obligation upon the State, one Legislature cannot charge succeeding Legislatures with the duty of making appropriations." *McCutcheon v. State Building Authority,* 13 N. J. 46, 66, 97 A. (2d) 663.

The Supreme Court of Louisiana held an act creating an extended obligation not to be an appropriation but a dedication to a specific use, which does not violate the constitutional limitation.[14] Similar views were expressed by the South Carolina Supreme Court. It said:

"It is a universally accepted tenet of constitutional law that a legislature may enact statutes which result in contracts which may be of effect beyond the life of the enacting legislature. The bonds here contemplated and the pledge of revenue for the payment of them will constitute such contracts and are therefore within the legislative power. The obligations of them will be protected from impairment by the federal and state constitutions. U. S. Const., Art. 1, sec. 10 S. C. Const. of 1895, R. I., sec. 8. To give force to relator's contention hereabout would render impracticable, if not impossible, the issuance of bonds at all. *Wolff v. New Orleans,* 103 U. S. 358, 26 L. Ed. 395. *State of Indiana ex rel. Anderson v. Brand,* 303 U. S. 95, 58 S. Ct. 443, 82

the constitutional amendment, in extending the facilities of the State highway system." *State of Florida v. Florida State Imp. Comm.,* 160 Fla. 230, 242, 34 So. (2d) 443.

[14] "Appellees' fourth complaint, listed in Paragraph (d) of their plea, is that the statute violates Article 4, Section 1 of the Louisiana Constitution, by providing for the disbursement of public money from the State Treasury without any specific appropriation and by undertaking to distribute the proceeds of the tax for a longer period than two years. The referred to constitutional provision reads in part: 'No money shall be drawn from the treasury except in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years.' According to Section 6 of the statute, the proceeds of the tax must be deposited in a special fund and all used by the Louisiana Sweet Potato Advertising Agency in conducting its publicizing and promotion campaign. By this method there is created a dedication, not an appropriation, and the mentioned constitutional provision is not violated. . . ." *Louisiana State Department of Agriculture v. Sibille,* 207 La. 877, 893, 22 So. (2d) 202.

L. Ed. 685. Our gasoline tax 'diversion cases' demonstrate this court's fidelity to the principle. *State ex rel. Edwards v. Osborne*, 193 S. C. 158, 7 S. E. (2d) 526. *State ex rel. Edwards v. Osborne*, 195 S. C. 295, 11 S. E. (2d) 260." *State ex rel. Roddey v. Byrnes*, 219 S. C. 485, 499, 66 S. E. (2d) 33.

The Supreme Court of Minnesota holds that the constitutional provision does not restrict the legislature from binding its taxing power to provide for the state's contractual obligation to pay.[15]

Respondent urges as an additional objection that chapters 7 and 9, by authorizing a retention of a million dollars in the Puget Sound reserve account as a guaranty fund, violate the restriction in amendment 18 to the state constitution[16] which requires all license fees and excise taxes derived from the sale of motor vehicle fuels to be used exclusively for highway purposes.

▉ The Puget Sound ferry system and the Hood Canal bridge are both integral parts of the highway system.[17] From what has been said, it is apparent that any loan from the Puget Sound reserve account will ultimately be repaid from tolls. Consequently, it is idle to say that the temporary employment of such funds to assist the development of the state highway system is within the diversion interdicted by the eighteenth amendment. The Puget Sound ferries operated by the state and the Hood Canal bridge are all indispensable links in the state highway system.

---

[15]"Although the legislature may not surrender, suspend, or contract away the state's power of taxation (Minn. Const. Art. 9, § 1), there is nothing in the constitution which prohibits the legislature from irrevocably binding its taxing power to provide the funds necessary to fulfill the state's contractual obligations to pay money." *Naftalin v. King*, 252 Minn. 381, 388, 90 N. W. (2d) 185.

[16]See note 12.

[17]*Puget Sound Nav. Co. v. Department of Public Works*, 156 Wash. 377, 287 Pac. 52; *Savage Truck Line v. Commonwealth*, 193 Va. 237, 68 S. E. (2d) 510; *Jeff Hunt Mach. Co. v. South Carolina State Highway Department*, 217 S. C. 423, 60 S. E. (2d) 859; *Deans v. County of Coconino*, 41 Ariz. 253, 17 P. (2d) 801; *Puget Sound Nav. Co. v. United States*, 107 F. (2d) 73; *United States v. Washington Toll Bridge Authority*, 190 F. Supp. 95.

This was recently exemplified in *Gross v. Washington State Ferries, supra,* in which we said:

" . . . The state of Washington is acting in a governmental capacity when it operates the Puget Sound Ferry System by its statutory agent, the Washington Toll Bridge Authority. The operation is an integral part of the highway system; its operation is an exercise of a traditional and essential governmental function, although, at one time, a portion of the ferry system was operated by private enterprise. In *Riddoch v. State,* 68 Wash. 329, 335, 123 Pac. 450 (1912), this court held:

" ' . . . the state is inherently sovereign at all times and in every capacity. . . . If it may constitutionally take over any enterprise, though usually of the nature of a private business, the very taking over is an exercise of this sovereign power. It seems much more logical and much more consonant with the idea and genius of sovereignty that the enterprise thus taken over should be impressed with the sovereign character of the state than that the state should become hampered by the private character of the enterprise. The latter result is incompatible with the concept of sovereignty.'

"A ferry is a continuation of a public highway from one side of a body of water, over which it passes, to the other. It serves as a bridge and is part of the highway system. It has been held that the operation of a ferry by the state, or by a subdivision or agency of the state, is not subject to the federal transportation tax because the state is acting in its governmental capacity. *United States v. King County, Wash.,* 281 Fed. 686 (C.C.A. 9th; 1922); *United States v. State Road Department, Florida,* 255 F. (2d) 516 (C.A. 5th; 1958); *United States v. Washington Toll Bridge Authority,* 190 F. Supp., 95 (D.C.W.D. Wash., S.D.; 1960) (Currently on Appeal to Court of Appeals for 9th Circuit.)."

We find the contention that such use of the funds violates the eighteenth amendment to be devoid of merit.

Respondent contends that the concluding paragraph in Laws of 1961, Ex. Ses., chapter 9, § 6, p. 2572, is unconstitutional because it delegates legislative power to the consulting engineer. The paragraph is:

"Tolls and charges shall not be increased in any case when in the opinion of such engineering firm the increase would so reduce traffic that no net gain in revenue would

result. The provisions of this section shall be deemed a covenant for the benefit of the holders of such bonds."

 The respondent's argument, that there is an attempted delegation of legislative power because the independent engineers would control the discretion of the Toll Bridge Authority, is a pure *non sequitur*, for only administrative authority, and not legislative power, is involved. Relator's comment, that if the advice of the employed consulting engineering authority is unfavorable others may be substituted, is unimportant for the same reason.

Legislative power is nondelegable, but there is no delegation of legislative power here for the fixing of tolls is purely an administrative function. Very definite standards are prescribed, to which any action of the Toll Bridge Authority must conform. The standards are that the tolls must be fixed so as to produce sufficient revenue to pay the principal and carrying charges of the outstanding bonds, and that, if the tolls are insufficient for this purpose, they must be increased but no increase shall be made if the net return thereby would be diminished.

That the fixing of tolls is an administrative function and not a legislative function was pointed out by the Supreme Court of Kentucky in *Bloxton v. State Highway Comm.*, 225 Ky. 324, 329, 8 S. W. (2d) 392. The significant portion of the opinion in that case is:

"It is insisted that the act violates sections 27 and 28 of the Constitution, in that it attempts to delegate legislative powers to the state highway commission. These sections of the Constitution divide the powers of the government of the state into three distinct departments, the legislative, the executive, and the judicial, and provide that no person or persons of one of these departments shall exercise any power properly belonging to either of the others. It is insisted that the provisions of the act authorizing the commission to fix the rate of toll for each bridge, the terms and maturity of the bonds, and the terms upon which bids may be made, confer upon the board legislative powers. While legislative powers may not be conferred upon any executive board, administrative powers may be conferred upon a board. *The rate of toll to be charged, the rate of interest to*

*be paid on the bonds, and the time the bonds shall run before maturity, are all matters to be determined under the facts and circumstances according to a reasonable judgment. Such matters are administrative; they are not legislative.* Such business details are, by many acts, committed to the boards having charge of the business, and it is well settled that such details of administrative matters may properly be left by the Legislature to the sound judgment of the board. Tolls are not taxes within the meaning of section 181 of the Constitution. For tolls are collected from every one who uses the bridge, whether a resident of this state or a non-resident, while taxes may only be levied upon residents of this state, or property having its situs in this state. Tolls are, strictly speaking, compensation paid for the use of the bridge and are similar to the tolls paid to a ferryman where a ferry is used. See Klein v. Louisville, 224 Ky. 624, 6 S. W. (2d) 1104." (Italics ours.)

Our cases are in accord: *State ex rel. Banker v. Yelle,* 183 Wash. 380, 48 P. (2d) 573; and *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120.

The two cases relied upon by respondents (*State ex rel. Scofield v. Schaaf,* 185 Wash. 354, 54 P. (2d) 1014, and *Trudeau v. Pacific States Box & Basket Co.,* 20 Wn. (2d) 561, 148 P. (2d) 453) do not touch this question but are solely concerned with tariff orders of the Department of Public Service.

The final contention is that, in the agreement provided for in the resolution authorizing the refunding bonds, the Toll Bridge Authority has "unlawfully assumed legislative power in violation of Article II, section 2, amendment 7 of the constitution of the state of Washington."

The resolution (No. 362, § 30)[18] provides (1) that a copy

[18]"(1) A certified copy of the resolution proposed to be adopted for the authorization of said bonds shall be filed with the Trustee. Said resolution shall find and declare the necessity for the issuance of the additional bonds and shall state therein the amount and terms of such bonds and in general a description of the facilities proposed to be constructed, reconstructed or acquired.

"(2) The Authority shall file with the Trustee a certificate by the Executive Secretary of the Authority certifying that the net revenue of the Ferry System available for debt service for any twelve (12) consecutive months of the fifteen (15) months immediately preceding

of the resolution authorizing the parity bonds is to be filed with the trustee; (2) that the certificate of the authority as to the net revenue of the ferry system for an annual period will amount to 1.25 times the average annual principal and interest requirements of the then outstanding bonds; and (3) that the resolution authorizing the parity bonds shall provide for the deposit of sufficient funds for the average annual debt service requirements in the principal and interest reserve account in the bond fund.

Laws of 1961, Ex. Ses., chapter 9, § 1, p. 2569, authorizes the issuance of parity bonds,[19] but provides that such addi-

---

the issuance of said certificate, together with the moneys paid into the Puget Sound Reserve Account of the Motor Vehicle Fund during the same twelve (12) months period pledged to pay such debt service, are equal to at least 1.25 times the average annual principal and interest requirements of the then outstanding Bonds and any additional bonds hereafter issued on a parity therewith then outstanding and the additional bonds proposed to be so issued, and certifying that there is no accumulated deficiency in any of the required accounts in the Bond Fund, as provided in this Resolution and in any resolution authorizing the issuance of additional parity bonds.

" (3) The resolution authorizing such additional parity bonds shall provide that an amount equal to the average annual debt service requirements of the additional bonds proposed to be so issued shall be deposited in the Principal and Interest Reserve Account in the Bond Fund out of the proceeds received from the sale of such additional bonds." Resolution No. 362, § 30.

[19]"The Washington toll bridge authority is authorized to issue revenue bonds to refund all or any part of the authority's outstanding 1955 Washington state ferry system refunding revenue bonds and 1957 ferry and Hood Canal bridge revenue bonds, and may issue additional revenue bonds in parity therewith to pay costs of improving the Washington state ferry system or constructing or improving transportation facilities for the crossing of Puget Sound and any of its tributary waters and connections thereof other than bridging from the east side of Puget Sound to the Kitsap Peninsula, Vashon Island or Bainbridge Island: *Provided,* That the toll bridge authority shall not issue any such additional revenue bonds without further express authorization by the legislature. With respect to the issuing of such bonds and the payment of principal and interest thereon, the payment into reserves, sinking funds, and the ferry improvement fund established in connection therewith, and the fixing and revision of charges for services and facilities of the system, and in managing all its fiscal operations, the authority shall have all the powers and shall follow the same procedures established for it under existing laws, except as otherwise provided herein." Laws of 1961, Ex. Ses., chapter 9, § 1, p. 2569.

tional bonds shall not be issued without further express legislative sanction. RCW 47.60.060 empowers the Toll Bridge Authority to include in any bond resolution any provision deemed necessary for the use of the "revenues from the undertaking."

■ The legislature obviously could not know all of the details necessary for the successful marketing of this particular class of bonds. It has habitually, therefore, authorized the administrative agency to negotiate such details. Similar agreements were considered in *State ex rel. Washington Toll Bridge Authority v. Yelle,* 56 Wn. (2d) 86, 351 P. (2d) 493, and approved. While no such bonds have been authorized, and cannot be without further legislative sanction, it is inconceivable that it would be found desirable to transcend the reasonable minimal requirements of the resolution.

We find the objection to be devoid of merit.

Two remaining matters require mention:

(1) Respondent claims that the Budget Director has not approved and allotted the $1,700,000 appropriation to the Toll Bridge Authority, for which reason it is asserted that the application for our mandate is premature. Relator advises, without contradiction, that the director has since approved and allocated to it the appropriation in question.

(2) The answer of the respondent challenges the authority of the State Finance Committee to sell the state toll bridge bonds now held by it, and the authority of the State Employees' Retirement Board and of the Washington State Teachers' Retirement System to sell the Toll Bridge Authority bonds held by them, but we find ample authority therefor in RCW 41.40.070, RCW 41.32.200, RCW 51.44.100 and Laws of 1907, chapter 12, p. 16, as amended by Laws of 1935, chapter 76, p. 167 (*cf.* RCW 43.84.010).

The writ will issue.

FINLEY, C. J., HILL, WEAVER, HUNTER, and HAMILTON, JJ., concur.

OTT, Acting C. J.—The foregoing opinion had been prepared by Judge Harry Ellsworth Foster before his death.

A majority of the remaining members of the court have adopted it as their opinion, and, for the reasons therein assigned, the writ will issue.

HILL, J. (concurring specially)—I have signed the majority opinion, but desire to make it clear that while I agree that the enrolled-bill doctrine is properly applied in the majority opinion, as it was in *State ex rel. Bugge v. Martin* (1951), 38 Wn. (2d) 834, 232 P. (2d) 833, I still adhere to the views expressed in *Power, Inc. v. Huntley* (1951), 39 Wn. (2d) 191, 235 P. (2d) 173, and in the concurring opinions in *Derby Club, Inc. v. Becket* (1953), 41 Wn. (2d) 869, 252 P. (2d) 259, to the effect that there may be occasions when the court will not be bound thereby.

Particular attention is directed to page 39 of the majority opinion where it is said that we place no reliance on the reasoning of the opinion in the *Gruen* case (*Gruen v. State Tax Comm.* (1949), 35 Wn. (2d) 1, 211 P. (2d) 651) to support the conclusion in this case that there is no violation of the fourteenth amendment to the state constitution involved. I would make it unequivocally clear that, so far as I am concerned, the *Gruen* case holding on the issue of what constitutes a state debt and what constitutes a surrendering or contracting away of the power of taxation is at least suspect and may not be followed, should those questions arise again in a situation not governed by the eighteenth amendment to the state constitution.

WEAVER, J., concurs with HILL, J.

ROSELLINI, J.—I concur with Judge Hill's opinion with regard to the enrolled-bill doctrine and the *Gruen* case.

DONWORTH, J. (dissenting)—The majority opinion approves the issuance of these refunding bonds by the Toll Bridge Authority on the theory that they are revenue bonds payable solely from the money derived from the operation of the state ferry system and the Hood Canal bridge. The basis of this holding is that, under the eighteenth amendment, all excise taxes on the sale, distribution, and use of

motor vehicle fuel shall be placed in a special fund to be used exclusively for highway purposes, and since the state can issue bonds for highway purposes, " . . . the implication is that it can covenant that the excise taxes directed by the constitutional amendment to be paid into the fund will be adequate for the payment and servicing of the bonds."

If the bonds were payable solely from the revenues derived from the operation of the two facilities involved, I would concur with the majority, but, as I view the proposed transaction, the bondholders are being given a guaranty, at least in part, by the levy of a special tax because the bonds contain the following covenant:

"The State of Washington has agreed to continue to impose the $\frac{1}{4}$ cent of motor vehicle fuel tax and $\frac{1}{4}$ cent of use fuel tax required by law to be deposited in the Puget Sound Reserve Account of the Motor Vehicle Fund."[20]

As pointed out in the concurring opinion in *State ex rel. Hoppe v. Meyers,* 58 Wn. (2d) 320, 363 P. (2d) 121 (1961), there is no $\frac{1}{4}$ cent tax imposed for the purpose indicated; but, the legislature has distributed to the Puget Sound reserve account, for the purposes discussed in the majority opinion, a portion of the $7\frac{1}{2}$ cents per gallon motor vehicle fuel sales tax and the motor vehicle use tax equivalent to the amount which would be raised by a $\frac{1}{4}$ cent per gallon tax.

By the above-quoted provision in the bonds (which is authorized by the legislature in Laws of 1961, Ex. Ses., chapter 7, §§ 1, 4, 18, 19, 20, and 21), the state obligates itself to continue to levy an excise tax on motor vehicle fuel sales and the use thereof amounting to $\frac{1}{4}$ of one cent per gallon until all outstanding bonds have been retired. The proceeds of the $\frac{1}{4}$ cent tax are required to be paid into the motor vehicle fund and credited to the Puget Sound

[20]The two outstanding bond issues which are to be refunded by the proceeds of this $38,000,000 issue are true revenue bonds payable solely from the tolls and other revenues of the respective facilities. See *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120 (1938).

reserve account. The sole purposes for which funds deposited in the reserve account may be used are stated in sections 19, 20, and 21 of chapter 7, as follows:

"Sec. 19. Whenever the total balance in the Puget Sound reserve account shall exceed one million dollars, a sum equal to such excess of one million dollars shall be transferred from the Puget Sound reserve account and shall be expended by the state highway commission pursuant to proper appropriation or reappropriation for state highways for other state highway commission purposes.

"Sec. 20. The Puget Sound reserve account shall be used by the Washington toll bridge authority for the following purposes:

"The authority may pledge any moneys in the Puget Sound reserve account or to be deposited in said account to *guarantee the payment of principal or interest* on (1) bonds issued to refund the outstanding 1955 Washington state ferry system refunding bonds and the 1957 ferry and Hood Canal bridge revenue bonds, or (2) subsequent parity bonds issued to pay costs of improving the Washington state ferry system or constructing additional transportation facilities for the crossing of any part of Puget Sound other than bridging between the east side of Puget Sound to the Kitsap Peninsula, Vashon Island or Bainbridge Island: *Provided*, That the authority shall not pledge any moneys in the Puget Sound reserve account to guarantee interest or principal on such parity bonds without further express authorization by legislative act.

"The authority may further pledge moneys in the Puget Sound reserve account to meet any sinking fund requirements or reserves established by the authority with respect to any new bond issues provided for in this section.

"*To the extent of any pledge herein authorized, the authority shall use the first moneys available in the Puget Sound reserve account to meet such obligations as they arise.*

"Sec. 21. Notwithstanding the provisions of section 19 the treasurer shall never transfer any moneys from the Puget Sound reserve account for use by the state highway commission for state highway purposes *so long as there is due and unpaid any obligations for* payment of principal, interest, sinking funds or reserves as required *by any pledge of* the Puget Sound reserve account. Whenever the authority shall have pledged any moneys in said account for the purposes authorized in section 20 of this amendatory act,

*the state agrees to continue to deposit* in the Puget Sound reserve account *the motor vehicle fuel taxes* and use fuel taxes as provided in sections 1 and 4 of this amendatory act, *and further agrees that* so long as there exists any outstanding obligations pursuant to such pledge, *to continue to impose such taxes."* (Italics mine.)

Thus, the state has expressly covenanted with the bondholders to continue to levy the ¼ cent excise tax on the sale of motor vehicle fuels and to deposit the proceeds in the Puget Sound reserve account and has authorized the Toll Bridge Authority to pledge any funds in that account to guarantee the payment of principal or interest of the bonds in accordance with the statutory provisions above quoted.

In *State ex rel. Washington Toll Bridge Authority v. Yelle,* 54 Wn. (2d) 545, 342 P. (2d) 588 (1959), we disapproved the guaranteeing of toll bridge revenue bonds by the State Highway Commission by the pledging of not more than $750,000 per year out of the proceeds of an excise tax on the sale of motor vehicle fuels pursuant to a provision of the 1959 supplemental appropriations act. That case involved thirty million dollars of revenue bonds to be issued by the Toll Bridge Authority for the construction of the second Lake Washington bridge under Laws of 1957, chapter 266, p. 1037, which provided that the bonds "shall be payable both principal and interest solely from the tolls and revenues derived from the operation of said toll facility." In holding that the attempted pledge of excise tax funds was invalid, the majority opinion said:

"This does not mean that the bridge across Lake Washington need be delayed. It is clear that chapter 266, Laws of 1957, gives requisite authority to proceed. The seven hundred fifty thousand dollars a year, which counsel say would probably never be used, falls far short of being sufficient to guarantee even the annual interest on thirty million dollars worth of bonds; but it is an entering wedge. *If the court were to approve the method used here to make a token guarantee from tax sources of what are supposedly revenue bonds, it would afford the precedent for complete guarantees from tax sources by a similar procedure."* (Italics mine.)

The last sentence in the foregoing quotation is prophetic of the trend which this court is now pursuing and of the ultimate logical result of the majority opinion in this case. I am unable to discern any distinction between these two transactions which justifies the opposite results arrived at in these cases.

Even before the adoption of the eighteenth amendment to our constitution in 1944 (which restricted the use of motor vehicle license fees and excise taxes on motor fuels to highway purposes as defined therein) the legislature had created the motor vehicle fund as a permanent fund. In 1939, the legislature attempted to appropriate a portion of this fund to pay and refund local improvement district assessments duly levied for the cost of the improvement of Aurora Avenue, an arterial highway in Seattle. After two en banc hearings, this court, in *State ex rel. Collier v. Yelle,* 9 Wn. (2d) 317, 115 P. (2d) 373 (1941), held that the money in the motor vehicle fund could not be used for this purpose because it was not a public purpose. In dealing with the contention that the fourteenth amendment (adopted in 1930) applied only to ad valorem taxes, this court said:

"If it be suggested that the fourteenth amendment to the state constitution applies only to taxes levied against property, as that word is defined in the amendment, and that such taxes as support the motor vehicle fund are neither property taxes nor are they levied, such an argument would be untenable. The first sentence of the amendment reads as follows: 'The power of taxation shall never be suspended, surrendered or contracted away.' This, of course, refers to *all taxes* collected by the state, *including* property, *excise,* and all other taxes. The amendment, then, in scope covers *all the state's power to levy taxes.*

"In the second sentence of the amendment, above quoted, the opening words 'all taxes' apply to the first clause of the sentence, and also to the last clause, 'shall be levied and collected for public purposes only.'

"In referring to privilege taxes, the state sales tax, and similar exactions, this court has repeatedly referred to such taxes as 'levied.' *Shell Co. v. State,* 113 Wash. 632, 194 Pac. 835; *Morrow v. Henneford,* 182 Wash. 625, 47 P. (2d)

1016; *Spokane v. State,* 198 Wash. 682, 89 P. (2d) 826. The legislature, in Laws of 1935, chapter 180, p. 726, § 31, relating to the compensating tax, used the word 'levied,' *and the same word is found* in Rem. Rev. Stat. (Sup.), § 8327-23 [P.C. § 7068-93] (Laws of 1933, chapter 58, p. 326, § 23), *referring to the gasoline tax.*" (Italics mine.)

In *State ex rel. Washington State Bldg. Financing Authority v. Yelle,* 47 Wn. (2d) 705, 289 P. (2d) 355 (1955), the special fund bonds provided for in Laws of 1955, Ex. Ses., chapter 12, were held to be in violation of Art. 8 of the constitution. The plan before the court in that case was described in the decision as follows:

"Chapter 12, Laws of 1955, Ex. Ses., p. 1754, is a comprehensive plan to finance, construct, and operate needed buildings and facilities for the institutions of higher learning and for the various agencies and departments of the state. It creates 'a body corporate and politic' to be known as the state building financing authority, consisting of three members: the Governor, or his representative; the state treasurer; and the director of general administration.

"Briefly, the plan is this. The authority is to purchase or lease land from the institutions of higher learning and the various agencies and departments of the state, erect and equip buildings thereon, and then lease them back to the institutions of higher learning and various agencies and departments for terms not to exceed thirty years; at such rentals as it shall determine. The construction is to be financed by the issuance of revenue bonds to mature at a time not to exceed thirty years from their respective dates, and to draw interest at four per cent per annum, which shall be the obligation of the authority alone, and not the obligation of the state or any of its institutions of higher learning, agencies, departments, or instrumentalities."

The language found in the last paragraph of the decision holding these bonds to be invalid is, in my opinion, particularly significant in the case at bar. The majority there stated:

"We recognize the housing problem with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking

in order to assist the state in its problem. We can not close our eyes to what is actually being attempted. When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation."

My views as to the meaning and effect of Art. 8 of our constitution are well stated by Judge Hill in his dissent in *Gruen v. State Tax Comm.,* 35 Wn. (2d) 1, 211 P. (2d) 651 (1949) (in which three judges concurred). He there said:

"The majority's position that the eighty million dollars in bonds contemplated by chapter 180, p. 496, of the Laws of 1949 will not be a debt as that term is used in Art. VIII of our constitution, seems to me to disregard the clear intent of the constitutional provision. In that article it is stated that '. . . no debts shall hereafter be contracted by or on behalf of this state . . .' except as provided in §§ 1, 2, and 3 thereof. Section 1 provides that the state may contract debts, not at any time exceeding a total of four hundred thousand dollars, to meet casual deficits, failures in revenue, or expenses not provided for. Section 2 provides that the state may contract debts (and there is no limit) to repel invasion, suppress insurrection, or defend the state in war. Section 3 provides for the authorization of a debt by law (and there is no limit) if it is for some single work or object distinctly specified in the law, and if the law provides ways and means, exclusive of loans, for the payment of the interest on such debt and for payment of the principal within twenty years. Such a law cannot take effect until it has received a majority vote of the people at a general election.

"Section 1 is for casual deficits, *etc.,* small in amount; § 2 is for great emergencies; § 3 gives the procedure which would normally be followed to incur a state debt. It was under § 3 that the World War I bonus was enacted and upheld by this court. *State ex rel. Hart v. Clausen,* 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580; *State ex rel. Hart v. Clausen,* 117 Wash. 260, 201 Pac. 30.

"It must be noted that the majority does not suggest that the act here in question comes under the exceptions referred to in §§ 1, 2, or 3. Its position is that the obligation to pay the eighty-million-dollar bond issue will not be a debt of the state of Washington within the purview of the

declaration of Art. VIII of the constitution that '. . . no debts shall hereafter be contracted by or on behalf of this state. . . .'"

Parenthetically, I note Judge Hill's observation that the foregoing constitutional provisions do not apply to bond issues payable from revenues of self-liquidating projects such as the operation of toll bridges. However, in the case at bar, the bonds are *not* self-liquidating as far as the bondholders are concerned because, *in addition* to the revenues of the facilities as a source of payment of their bonds, they are also receiving a pledge of the proceeds of a specific tax (one quarter cent) covenanted to be levied for their benefit for 40 years.

After stating the application of Art. 8 to the facts of the *Gruen* case, Judge Hill, in his dissent, exhaustively reviewed the decisions from other states regarding the incurring of state indebtedness. I adopt his views therein expressed as part of this dissent.

The question arises: When are revenue bonds *not* revenue bonds? The answer is: When they are guaranteed in whole, or in part, by the proceeds of a state tax.

A similar question was decided by this court in *Asia v. Seattle,* 119 Wash. 674, 206 Pac. 366 (1922), which involved an issue of $15,000,000 of revenue bonds delivered to the Puget Sound Power & Light Company in payment for the sale of its street railway system to the city in 1919. Thereafter, there was protracted litigation in both the state and federal courts as to the rights of the power company as sole bondholder. A group of taxpayers (known as the 14 taxpayers) brought a suit in the state court against the city of Seattle to enjoin the use of general fund money to service the bonds or pay the costs of maintenance and operation of the system. The power company brought an action in the federal court to enjoin the 14 taxpayers from prosecuting their action in the state court. The trial court dismissed the action for want of equity. (The dismissal of this action was subsequently affirmed by the

court of appeals in *Puget Sound Power & Light Co. v. Asia*, 277 Fed. 1.)

The power company, as sole bondholder, also brought an action in the federal court against the city seeking specific performance of the contract. The district court, after trial, entered a decree of specific performance directing the city to operate the system, charge fares adequate to produce sufficient revenues to pay the principal and interest on the bonds and, in addition, the costs of maintenance and operation of the system. It was further provided that, if the revenues should not be sufficient to service the bonds, the city must pay the costs of maintenance and operation "out of the general fund or any fund available" and, if the operation of the system would otherwise cease, the city was ordered to pay those costs out of the general fund or any source other than from the gross revenues of the system. *Puget Sound Power & Light Co. v. Seattle*, 282 Fed. 712. (This decree was subsequently reversed by the court of appeals and the action ordered dismissed for want of equity in *Seattle v. Puget Sound Power & Light Co.*, 284 Fed. 659.)

While the decree of specific performance was in full force and effect, the taxpayers' appeal in *Asia v. Seattle, supra,* came before this court. No constitutional question was involved, but the question of the statutory authority of the city which had issued these utility revenue bonds to use general tax funds (without submission to, and approval of, the voters) to directly or indirectly discharge its bond obligations was squarely presented to this court. The question presented was stated as follows:

"The question then is, may the city voluntarily or involuntarily encroach upon its general fund, or otherwise place upon the taxpayers the burden of meeting deficits of any kind incurred by reason of the carrying out of the plan of purchase or the operation and maintenance of the system thereunder?"

After quoting the applicable statute (then designated as § 8008, Rem. Code (P. C. § 1217)), which authorized the issuance of utility bonds by a city where no general indebtedness was to be incurred (and hence no vote of the

qualified electors was necessary) by following the procedure therein prescribed, this court continued:

"Unquestionably the statute means what it says, and says what it means, when it provides that no general indebtedness shall be created without the submission of that question to the voters, and that, in creating a special fund, the city shall have 'due regard to the cost of operation and maintenance.' Had it been contemplated that a general indebtedness might arise from the operation and maintenance, the language quoted would not have been used. *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998; *Schooley v. Chehalis,* 84 Wash. 667, 147 Pac. 410."

Referring to loans which the city had made from its general fund to keep the street railway system in operation in the face of a deficit in gross revenues, it was further said:

" . . . Here we have a special fund which owes many millions, a considerable deficit appeared almost immediately, and has steadily grown. None of the efforts of the city so far have resulted in providing an income sufficient to meet the outgo. If borrowing is continued, either directly or by overdraft, the final result will inevitably be that the moneys borrowed will be permanently diverted from the fund to which they belong and appropriated to the use of the utility, *just as certainly as though such an appropriation were directly made in the first place. That which may not be done directly must not be accomplished by indirection. When, as here, the court can certainly see a final unlawful result, it should enjoin the act by which the unlawful result will otherwise be accomplished.*

"We are not now concerned with questions other than the one before us, and are not called upon to advise the city how, if at all, it may solve the very serious problem which has arisen from what has proven to be the erroneous judgment of its legislative body; but we are clear that only one construction can be placed upon the statute which governs this situation, and that is that *when it is proposed that any general indebtedness be incurred* for such a purpose *as is here considered, the matter must be submitted to the voters;* and if not so submitted, all obligations arising from the acquisition, operation and maintenance of the utility *must be met from its revenue,* and, in any event, by no action of the city or its officials *can the burden be shifted to the*

*shoulders of the taxpayers,* who have had no opportunity to say *whether they will or will not accept the hazard.* . . ." (Italics mine.)

The analogy between the situation in the *Asia* case and the plan here involved, to pledge the proceeds of a tax which is covenanted by the legislature to be levied for some 40 years, seems very plain to me.

In the case at bar, we have a total disregard of the provisions of Art. 8, § 3, of our constitution, which, as already pointed out in the first dissent in the *Gruen* case, *supra,* specifically states that:

" . . . [N]o debts shall hereafter be contracted by, or on behalf of this state, *unless* [1] such debt shall be authorized by law [2] for some single work or object . . . distinctly specified therein . . . [3] ways and means, exclusive of loans, [shall be provided] for the payment of the interest [thereon] . . . as it falls due, [4] and also to pay and discharge the principal of such debt within twenty years . . . [and 5] No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people." (Italics mine.)

There is nothing in the constitution indicating an intention that this section has any application to contingent indebtedness, the pledging of tax proceeds, or the partial guaranty by the state with respect to the principal or interest of revenue bonds issued by its instrumentalities.

As said in the *Asia* case, *supra,* in applying the statute which, under certain conditions, permitted the issuance by cities of utility revenue bonds without a vote of the people:

" . . . [B]ut we are clear that only one construction can be placed upon the statute which governs this situation, and that is that when it is proposed that any general indebtedness be incurred for such a purpose as is here considered,

the matter must be submitted to the voters; and if not so submitted, all obligations arising from the acquisition, operation and maintenance of the utility must be met from its revenue, and, in any event, by no action of the city or its officials can the burden be shifted to the shoulders of the taxpayers, who have had no opportunity to say whether they will or will not accept the hazard. The trial court should have granted the prayer of appellants and enjoined the city and its officials from in any manner encroaching upon the general fund or placing the burden in any degree upon the taxpayers."

The majority opinion in the present case appears to base its approval of pledging tax funds to secure, in part, the payment of the principal and interest of these refunding bonds upon the provision in the statute that the collection of tolls will continue *after* the bonds have been retired, and thus any tax funds which have been diverted from the highway fund created by the eighteenth amendment will be restored.

The fallacy of this reasoning is that, instead of the bondholders assuming the risk of the revenues being insufficient to service the bonds and to pay the costs of maintenance and operation of the facilities, that risk is shifted to the shoulders of the taxpayers who (as required by Art. 8, § 3, of the constitution) have had no opportunity to say whether or not they will accept the hazard. The fact that tax money unlawfully diverted from the highway fund may be restored during or after the 40-year period does not, in my opinion, cure the serious legal defect in this refunding plan.

The majority cites *State ex rel. Bugge v. Martin*, 38 Wn. (2d) 834, 232 P. (2d) 833 (1951), which has a material bearing on the problem before us. In that case, I wrote a concurring opinion (in which two other judges concurred) upholding the issuance of the limited obligation bonds involved in that case which were payable from excise tax revenues derived from license fees and other taxes levied on the sale and use of motor vehicle fuels, the proceeds of which were required to be placed in the highway fund created by the eighteenth amendment. In the legislative

act authorizing the bonds, the legislature agreed to continue to impose the same excise taxes on motor vehicle fuels in amounts sufficient to pay all principal and interest on the bonds when due. In my opinion, I stated that no unconstitutional state indebtedness was created by the issuance of those bonds.

I now believe that I was in error in so stating unless there is a logical distinction between that case and the one at bar. The *Bugge* case did not involve any bonds payable out of the revenues received from the operation of a facility by a state agency or the pledge of tax funds to guarantee, in whole or in part, the payment of the principal or interest thereof. The bonds there issued were similar to tax anticipation warrants, *i.e.*, they were payable solely from the proceeds of certain excise taxes which the state agreed to continue in effect during the life of the bonds. If this distinction be not valid, then I was in error in the conclusion reached in my concurring opinion in the *Bugge* case.

To summarize my position in the present case, there used to be *two* kinds of bonds at the state level—general obligation bonds and revenue bonds issued by agencies of the state. Now we approve a third kind, a hybrid bond, which is payable out of the revenues derived from the operation of a certain facility (operated by a state agency), but is also secured to a specified extent by the pledge of certain excise taxes which the state covenants to continue to levy until the revenue bonds are paid in full. By the issuance of this hybrid bond, the state assumes a contingent liability to pay interest or principal (or part thereof) without showing this item as a liability. The practical result of the continuance of this program is discussed in the dissenting opinions in *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651 (1949), and in *State ex rel. Washington State Bldg. Financing Authority v. Yelle, supra.*

The argument that it is necessary to have some kind of state guaranty to market revenue bonds or that a lower rate of interest may thus be obtained (if persuasive) means only that the constitution may be ignored when it is deemed

expedient to do so. *Cf. State ex rel. Eastvold v. Maybury,* 49 Wn. (2d) 533, 304 P. (2d) 663 (1956), relating to the statutory authority of the state capitol committee to create a reserve fund for the payment of bonds. The legal question involved here is whether the people of this state are to have constitutional control of the incurring of state indebtedness. If the provisions of Art. 8 are considered to be too restrictive from a practical standpoint, they may be amended in the manner provided in the constitution, but such a situation does not warrant what is, in effect, a judicial amendment or repeal thereof. See Cooley, Constitutional Limitation (8th ed.), page 159.

What we said in *State ex rel. Lemon v. Langlie,* 45 Wn. (2d) 82, 273 P. (2d) 464 (1954), is pertinent in weighing such arguments of expediency as against the application of all constitutional provisions. We there said:

"The vice of this reasoning is that it destroys the usefulness and the very purpose of a written constitution. The function of a state constitution under our form of government is well stated in 11 Am. Jur. 651, Constitutional Law, § 44, as follows:

" 'A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. No function of government can be discharged in disregard of, or in opposition to, the fundamental law. The state Constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates; and the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of such Constitution.'

"If it be a fact that public convenience and administrative efficiency can be promoted by maintaining the thirteen state agencies at Seattle or elsewhere than at the seat of government, the constitution may be so amended by majority vote of the people. They have reserved to themselves the sole power to change our state constitution. What we said in *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac.

805, quoting with approval from 6 R.C.L. 46, is applicable to the present case:

" ' "A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, *even though the circumstances may have so changed as to make a different rule seem desirable.* In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, *constitutions do not change with the varying tides of public opinion and desire.* The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders." ' (Italics ours.)

"Accordingly, we are bound by the mandatory language of Article III and Article XIV of the constitution as adopted by the people in 1889 until such time as the people see fit to exercise their sovereign right to change it."

Sections 29 and 32 of Art. 1 of our constitution lay down two basic principles for its interpretation:

"The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." § 29

"A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." § 32

In my opinion, the people of the state of Washington are entitled to the enforcement of the constitutional provisions limiting the incurring of state indebtedness which they themselves placed in the constitution. This court should not render those provisions nugatory by holding that Art. 8, § 3, may be disregarded either in part or temporarily, and that the general taxing power of the state may be pledged to secure the payment of revenue bonds. There is no basis for such a distinction by the court where the people, in adopting these constitutional provisions, made

no distinction between any type of debt but included *all* state indebtedness payable from any type of state tax.

Applying the above-quoted principles of interpretation, I would, for the foregoing reasons, afford the taxpayer the protection which the constitution was intended to give him and would enforce the provisions of Art. 8, § 3, as written. The writ prayed for by the Toll Bridge Authority should be denied.

OTT, J., concurs with DONWORTH, J.

ROSELLINI, J., concurs in the result of the dissent.

